THE CITY OF CHICAGO, Defendant in Error, *vs.* THE CHICAGO CITY RAILWAY COMPANY, Plaintiff in Error.

*Opinion filed February 16, 1916—Rehearing denied April 5, 1916.*

1. STREET RAILWAYS—*section 2171 of Chicago code, concerning transfers, is not referable to police power.* Section 2171 of the Chicago code of 1911, providing that a street railway passenger who has paid his fare shall be entitled to a transfer ticket entitling him, without further charge, to be carried on any other adjoining, connecting or intersecting line of street railway, if used within one hour after the same is issued, at the point or place for which the transfer ticket is issued, is not referable to the police power of the city.

2. SAME—*when street railway may designate point at which a transfer is to be used.* Under the contract ordinance of 1907, concerning the giving of transfers by the Chicago City Railway Company, that company has the right to designate on the transfer the point or place of transfer and to refuse to honor a transfer presented at another place, even though the car on which the transfer is presented follows the same route, as far as the transfer point, as the car on which the transfer was given.

3. SAME—*provision of section 2171 of the Chicago code, allowing stop-over of one hour, violates contract ordinance of 1907.* The provision of section 2171 of the Chicago code of 1911 that a transfer may be used within one hour after it is issued, at the point of transfer, is inconsistent with the theory of a continuous trip for a single fare and is in violation of the contract ordinance of 1907, whereby transfers are required to be used at the point of transfer designated thereon within fifteen minutes after the point of transfer is reached, provided a car shall pass within that time going in the direction and over the route designated, otherwise the transfer to be good on the first available car.

WRIT OF ERROR to the Municipal Court of Chicago; the Hon. ARNOLD HEAP, Judge, presiding.

BUSBY, WEBER, MILLER & ROBINSON, JOHN R. GUILLIAMS, and BENJAMIN F. RICHOLSON, (W. W. GURLEY, and HARRY P. WEBER, of counsel,) for plaintiff in error.

RICHARD S. FOLSOM, Corporation Counsel, and GEORGE L. RECKER, (BRYAN Y. CRAIG, and JOSEPH F. GROSSMAN, of counsel,) for defendant in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The defendant in error, the city of Chicago, brought two suits in the municipal court of Chicago against the plaintiff in error, the Chicago City Railway Company, to recover penalties,—one under an ordinance providing for transfers for continuous trips on the cars of the plaintiff in error within the city limits, and the other under the requirement that the plaintiff in error should post two or more notices in each car containing substantially so much of the section providing for transfers as relates to transfer tickets. The cases were tried before the court without a jury and resulted in a fine of $100 for violating the section providing for transfers and $4550 for failure to post notices. The court certified that the validity of the ordinances was involved and the public interest required that a writ of error should be allowed from this court in each case. Accordingly writs of error were sued out and the cases were consolidated.

The cases were tried upon the testimony of one witness, the ordinances of the city and a stipulation of facts. The defendant has a street car line on Forty-seventh street running west from Lake Park avenue to Kedzie avenue. It also runs cars from Lake street south on State street to Archer avenue, southwest on Archer avenue to Canal street, south on Canal street to Twenty-ninth street, west on Twenty-ninth street to Wallace street, south on Wallace street to Root street, west on Root street to Halsted street, south on Halsted street to Forty-seventh street and west on Forty-seventh street half a mile to Racine avenue, where the cars turn south from the Forty-seventh street line into Racine avenue and continue south to Seventy-ninth street. The witness was a traction inspector for the city, and he testified that in order to make out a case against the defendant which he was instructed to make, he got on a west-bound

Forty-seventh street car at Wentworth avenue, paid a cash fare, secured a transfer, left the car at Forty-seventh and Halsted streets and boarded a car running in the same direction on the Forty-seventh street line which would turn into Racine avenue at the junction point when that avenue was reached, intending to go south in that avenue. He tendered his transfer to the conductor and it was refused, and he was told that he would have to transfer at Racine avenue and Forty-seventh street, which was the junction point. The witness testified that at Forty-seventh and Halsted streets, where he attempted to make the change, there are four saloons,—one on each corner,—and a coal yard near by and four lights within one hundred feet; that at Forty-seventh street and Racine avenue there is a saloon on each of three corners and a grocery store on the other, three arc lights near the corner, and the tracks of the Junction railway north, from which smoke and dust blow when the wind is in the north. The transfer given to the witness indicated the line on which it was issued, the direction in which the car was going and the time issued, and on the back was printed the following:

"Receivable *only*—at intersecting point, on a crossing, diverging or extension line—from person to or for whom issued, for a continuous trip in an onward direction.

"Good in reverse direction to next junction point on line from which issued.

"Void fifteen minutes after time punched."

The defendant is organized under a special charter passed in 1859 and amended in 1865, authorizing it to construct single or double-track railways in such streets as the city council of Chicago should authorize, and upon such terms and conditions and with such rights and privileges, immunities and exemptions as the council had contracted or might thereafter contract with it. Railway lines were constructed in the streets and controversies arose between the defendant and the city, which were settled in 1907 by an ordinance which was submitted to the legal voters of

the city and adopted and which was accepted by the defendant. By the ordinance the defendant agreed to pay to the city fifty-five per cent of the net receipts of its business, and it was stipulated that it had paid the city under the contract $5,946,188.41. It also agreed to make expenditures, which it was agreed had been made to the amount of $28,306,108.17. One of the provisions of the ordinance was that the defendant should furnish transfers entitling a passenger to ride upon any other line of its railway system which connects with, crosses, intersects or comes within a distance of two hundred feet of the line of the street railway upon which the passenger first took passage and paid his fare, and that the transfer might designate the point or place of transfer, and the same must be used at such point or place within a reasonable time, not exceeding fifteen minutes after such point or place is reached by the car from which the passenger is transferred, provided that within that time a car shall pass that point or place of transfer in the direction and upon the route indicated by the transfer, and if not, the passenger should have the right to take the first available car. Section 2171 of the Chicago code of 1911 provided that a passenger who had paid his fare should be entitled to a transfer ticket entitling him, without further charge, to be carried on any other line adjoining, connecting, crossing or intersecting any line of the street railway if used within one hour after the same is issued, at the point or place for which the transfer ticket is issued. On May 20, 1912, the section in question was amended by including elevated railroads, which was held in *Metropolitan Elevated Railway Co.* v. *City of Chicago,* 261 Ill. 624, to be beyond the power of the city. The section, therefore, was left the same as it existed prior to the amendment, and the prosecution was under the section as contained in the code and as amended. On November 13, 1913, an ordinance was passed reciting that four different railway companies operated street car lines within the city and that uni-

fied operation would greatly increase and improve the street railway facilities, and give to the Calumet district, where the existing fare was ten cents, the advantages of a single fare of five cents throughout the entire present and future limits of the city. Section 2 of that ordinance provided that it should be subject to all the terms, stipulations, requirements, conditions and obligations of the 1907 and subsequent traction ordinances of the city, except so far as such ordinances were expressly or by necessary implication modified or supplemented by that ordinance, and this was the last ordinance of the city council.

The claim of the city under these ordinances is that the railway company has no right to designate the place where the passenger may use the transfer, but that he has a right to change cars at any place he may choose before reaching a junction point, if he can take passage at that place in the direction of his destination in a car by which he can reach such destination. The railway company contends that under the conditions of the settlement ordinance, re-affirmed by the ordinance of 1913, it has a right to require the passenger to change cars at the place where the line by which he is to reach his destination crosses, intersects or connects with the line on which he is riding, and that the transfer may designate such place as provided in the contract ordinance of 1907.

To sustain the judgment the city relies upon two propositions, the first of which is that the provisions of section 2171 are a legitimate exercise of the police power, not changing or affecting the rate of fare, and which could not be contracted away by the contract ordinance of 1907 or otherwise. It is true that a municipality cannot contract away the right to exercise the police power to secure and protect the morals, safety, health, order, comfort or welfare of the public nor limit or restrain by any agreement the full exercise of that power. The police power may be exercised in a variety of ways in the regulation of street

car traffic for the public safety or convenience, such as providing against the overcrowding of cars, compelling proper seating facilities, specifying the side of the street at which stops shall be made, and any other matter which shall promote the public safety, comfort or convenience. But there is nothing in section 2171, if it is correctly interpreted by the city, which has any legitimate connection with the objects of the police power. The facts testified to by the witness for the city that there are four saloons on the corners at Forty-seventh and Halsted streets, and an adjoining coal yard and four street lights, and that there are three saloons and a grocery on the corners at Forty-seventh street and Racine avenue and three arc lights, with a railroad north of the corner, if they are of any importance, apply only to that locality. If they have any relation to the public health, morals, good order, comfort or convenience there is nothing to indicate that the same conditions exist generally all over the large city to which the ordinance relates, or that the objects of the police power would be promoted by the privilege of changing cars whenever or wherever the passenger might see fit, in disregard of intersecting, crossing or junction points. The city relies upon two cases wholly unlike this. One is *City of Chicago* v. *Chicago Union Traction Co.* 199 Ill. 259, where an ordinance requiring city railways, for the protection of the public health and safety, to keep clean a part of the street occupied by the tracks was sustained, and the other is *Minneapolis Street Railway Co.* v. *City of Minneapolis,* 189 Fed. Rep. 445, prohibiting overcrowding cars by carrying more passengers than the carrying capacity of a car. The attempt to change the terms of the contract cannot be referred to the police power.

The second proposition advanced in behalf of the city is, that even if the ordinance should be treated as a rate-making ordinance it is still within the power of the city, and the cases of *Chicago Union Traction Co.* v. *City of Chicago,* 199 Ill. 484, *City of Danville* v. *Danville Water Co.*

178 id. 299, and *Freeport Water Co.* v. *City of Freeport,* 186 id. 179, are relied upon as establishing the rule that a municipality is not bound by its contract respecting rates. Whether the decisions in those cases apply to any existing relation between the city and the railway company concerning rates of fare, or whether the city can lawfully reduce the rate and continue to have the benefits of the contract so far as it is executory, is not here involved because the ordinance is not a rate-making ordinance. The rate of transportation remains the same as under the contract ordinances of 1907 and 1913. By the contract ordinance of 1907 the rate of fare was to be five cents for a continuous trip within the city limits. When the ordinance of 1913 was passed the provision for the five-cent fare was extended to include four city railway systems operating separately and independently and each having a right to charge a separate fare. The reference in that ordinance to the contract ordinance of 1907 and other traction ordinances did not include any change in the fare. The only change that had been made by section 2171 of the code of 1911, as amended in 1912, was to provide that transfer tickets should be good for one hour at the point or the place for which the transfer ticket should be issued. No provision of any ordinance had changed or attempted to change the provision of the contract ordinance that the transfer given to a passenger might designate the point or place of transfer, and the ordinance of 1913 re-affirmed and continued all the terms, stipulations, requirements, conditions and obligations of the previous ordinances and was the last act of legislation by the city council. The object of the transfer provisions of the various ordinances was to enable a passenger to go from one point to another in the city on the street railway lines for a single fare of five cents. For that purpose it was provided that if it became necessary for him to change cars he should be entitled to make a change for the purpose of reaching his destination without the payment of an addi-

tional fare. The object of the ordinance would not be attained or advanced in any manner by permitting passengers to change back and forth from one car to another operating in the same direction upon the same street, but it was intended that a passenger should have a right to make a change to a car on any crossing, intersecting, diverging or extension line for the purpose of reaching his destination. We have sought in vain for any provision of section 2171 which in terms or by necessary implication repeals or attempts to repeal or modify the contract ordinance of 1907 with respect to the place where a transfer ticket may be used, or which gives or attempts to give to a passenger the right to use the transfer ticket at any other place than where a line joins, connects, crosses or intersects the line on which he has paid his fare.

The city had provided by section 2171 that a transfer ticket should be good for one hour after the same was issued, at the point or place for which the transfer ticket was issued. By section 2172 it was provided that two or more notices containing so much of section 2171 as relates to transfer tickets should be posted in each car, which notices should be easily legible and should be conspicuously posted on the inside of the car. The second suit was for penalties for failure to post such notices, and the evidence was that one notice was posted in each car, as follows:

"TRANSFERS—CITY ORDINANCE.

"Transfers will be issued only upon request at time fares are paid. Transfers will be honored *only*—at intersecting points, on a crossing, diverging or extension line—from person to or for whom issued, for a continuous trip in an onward direction. Good in reverse direction to next junction, except on the line from which issued. Void fifteen minutes after time punched."

Only one notice was posted, and the particular in which it failed to state the provisions of section 2171 is the statement, "void fifteen minutes after time punched." Under the contract of 1907 the transfer ticket was to be good for fifteen minutes after the place of transfer was reached by

the car from which the passenger was transferred, provided that within that time a car should pass that place in the direction and upon the route indicated by the transfer; that if no car should pass the point within that time the passenger was to have the right to take the first available car passing in the direction indicated by the transfer. That ordinance gave a stop-over privilege of fifteen minutes, and a passenger was entitled to any longer time necessary on account of a car not passing within that time. That was a reasonable provision, and gave to a passenger really making a continuous trip from one place to another in the city every privilege to which he was reasonably entitled. To allow a stop-over of an hour while cars upon which a passenger may take passage are passing, cannot be regarded as providing for a single fare for travel from one point to another within the city, but only as allowing an hour for purposes of business or pleasure not connected with nor an incident of travel from one place to another. Such a provision would permit the transaction of business at different points along the line of the street railway with intervals of an hour at each transfer point, which certainly cannot be regarded as anything but a disregard of the obligations of the contract ordinance. The rule of the railway company did not limit or restrain any right given to passengers, and the argument for the city that the provision allowing stop-overs of one hour is a police measure, unaffected by any contract, has no basis. The defendant was not bound to post two notices in each car advising passengers that they could stay an hour at each transfer point. The city, under its right to require a continuous passage for a single fare, was not thereby authorized to compel the railway company to permit several separate and independent trips in going from one place to another in the city. The notice posted did not conform to the ordinance in respect to the time in which a transfer could be used. Transfers are issued only upon request at the time fares are paid, and fifteen minutes,

or a much greater time, may, and frequently does, elapse after the transfer ticket is punched and received by the passenger before he reaches the place where the transfer is to be used. The city has a right, in the exercise of the police power, to require notices to be posted advising passengers of their rights respecting transfers, but, while the notice posted gives misinformation as to the time within which the transfer can be used, that fact did not give the city any right to recover penalties for not posting notices showing stop-over privileges of an hour at transfer points.

The judgment is reversed.    *Judgment reversed.*