(No. 11068.—Reversed and remanded.)

THE CITY OF CHICAGO et al. Appellees, *vs.* WILLIAM L. O'CONNELL et al. Appellants.

*Opinion filed April 19, 1917—Rehearing denied June 7, 1917.*

1. PUBLIC UTILITIES—*to what extent constitution has given to a city the control of the operation of street railways.* Section 4 of article 11 of the constitution gives to a city the control of the operation of street railways in its streets only to the extent of determining whether street railways shall be operated upon the streets of the city, and if so, upon what streets. (*Venner* v. *Chicago City Railway Co.* 258 Ill. 523, and *People* v. *City of Chicago,* 270 id. 188, explained.)

2. SAME—*meaning of provision of section 10 of Public Utilities act excepting public utilities owned by municipalities.* Section 10 of the Public Utilities act, which excepts from its operation public utilities owned by municipalities, means only that public utilities owned or operated by municipalities when the act became effective shall not be subject to the provisions of the act, and that thereafter, when a municipality shall become the owner or take over the operation of a public utility, such public utility will be withdrawn from the operation of the act.

3. SAME—*street railways of city of Chicago are within the provisions of the Public Utilities act.* Although the city of Chicago has by contract obtained an option to purchase the street railways in the city at a price agreed upon and has been given a voice in the management of the affairs of the street railway companies, the city is not the owner of the railway properties nor has the operation of the railway system been turned over to the city, and said railways are not within the exception contained in the definition of a public utility in section 10 of the Public Utilities act.

4. SAME—*exercise of police power over public utilities does not violate constitutional provisions protecting property rights.* The regulation of public utilities is one phase of the exercise of the

police power of the State, and the rightful exercise of such power over the use of private property which is devoted to public use does not violate constitutional provisions against the taking of property without due process of law and the taking or damaging of private property without just compensation.

5. SAME—*when order of Public Utilities Commission does not impair the obligations of a contract between city and street railway companies.* Where the street railways of a city are subject to the provisions of the Public Utilities act, an order of the Public Utilities Commission requiring only such things to be done by the railway companies as will, in the judgment of the commission, improve the service furnished the public, cannot impair the obligations of any contract between the city and the railway companies, as the city has no power to contract away any of the police powers delegated to it by the legislature.

6. SAME—*when question of reasonableness of an order cannot be determined.* The method prescribed by the Public Utilities act for determining the reasonableness of an order of the commission. is exclusive, and the question cannot be determined in a proceeding to enjoin the enforcement of the order.

7. SAME—*a public utility may obtain hearing on reasonableness of order although not a party to the original proceeding before the commission.* The provision for a review of the decision of the Public Utilities Commission upon an application for rehearing is the same as the provision for review of the original order, and since a public utility which was not a formal party to the original proceeding may ask for a rehearing it is not deprived of an opportunity to be heard upon the reasonableness of the order, and is therefore not deprived of property without due process of law because of the order.

8. POLICE POWER—*the police power is primarily vested in the legislature but may be delegated.* The police power is an attribute of sovereignty and is primarily vested in the legislature but may be delegated to agencies created by the legislature, and in such case the legislature has the right to recall the power at any time from the agency to which it is delegated and to retain it or confer it upon some other agency of government.

9. SAME—*a large discretion is vested in the legislature to determine what public interests require.* In the exercise of the police power the State may interfere whenever the public interests demand such interference, and in this particular a large discretion is necessarily vested in the legislature to determine not only what the interests of the public require but what measures are necessary for the protection of such interests.

CARTER, J., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. THOMAS TAYLOR, JR., Judge, presiding.

P. J. LUCEY, Attorney General, WILLIAM B. SCHOL-FIELD, TIMOTHY F. MULLEN, and EVERETT JENNINGS, for appellants.

SAMUEL A. ETTELSON, Corporation Counsel, CHESTER E. CLEVELAND, RALPH G. CRANDALL, W. W. GURLEY, HORACE KENT TENNEY, HARRY P. WEBER, and GEORGE W. MILLER, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

On October 18, 1915, the city of Chicago filed a bill for injunction in the circuit court of Cook county seeking to restrain the State Public Utilities Commission and the members thereof from enforcing a certain order made by the commission on September 29, 1915, relating to the equipment and operation of street cars in the city of Chicago. The order complained of required the Chicago Surface Lines, the Chicago City Railway Company and the Chicago Railways Company to operate street cars upon their lines at intervals to be determined by methods prescribed in the order, according to the relative seating capacity of cars passing a given point during certain periods fixed by the order and the aggregate number of passengers carried on said cars during such periods; to provide "turn-back" or "loop-back" service in the territory outside the loop district sufficient to comply with the service standard prescribed by the order; to prepare and submit to the commission, within sixty days, a comprehensive plan for the re-routing of cars in order to secure maximum track capacity; to proceed at once to acquire the equipment necessary to carry out the provisions of the order; to install within sixty days and use such trailers as may be necessary during the rush-hour period to comply with the service standard

278 — 38

prescribed by the order; to make application within thirty days to the proper municipal authorities of the city of Chicago for necessary permits and authority, and to the property owners for the necessary frontage consents authorizing and empowering the railway companies to make such track changes as may be required to enable them to comply with the provisions of the order; to display on all cars separate route and destination signs on the front and a route sign on the side; and to hereafter submit to the commission the plans for all new passenger cars and for the remodeling of all old passenger cars for approval of the width of passageways, height of steps, type and location of seats, platform arrangements, and such other details as affect the adequacy of service as the commission may from time to time require. The commission retained jurisdiction of the cause for the purpose of making any necessary modification of the order and such supplemental orders as it should deem proper and just.

The bill alleges that the city of Chicago was organized as a municipal corporation more than seventy years ago under a special charter, and was subsequently, on May 3, 1875, organized under the City and Village act of 1872; that the Chicago City Railway Company was organized as a corporation under certain special acts of the legislature, and the Chicago Railways Company, the Calumet and South Chicago Railway Company and the Southern Street Railway Company were organized under the general Incorporation act of this State. The bill then alleges that the city of Chicago on February 11, 1907, passed two certain ordinances, which were approved by the voters of the city at an election held April 2, 1907, and which are commonly referred to as the "settlement ordinances,"—one authorizing the Chicago City Railway Company to construct, maintain and operate a system of street railways in the city of Chicago, and the other authorizing the Chicago Railways Company to construct, maintain and operate a system of

street railways in the city of Chicago, upon the terms and conditions therein prescribed,—and alleges that the settlement ordinances were thereafter accepted by the Chicago City Railway Company and the Chicago Railways Company, and that the latter company thereafter, on February 25, 1908, acquired title to the street railway properties theretofore known as the Chicago Union Traction System; that thereafter, on March 30, 1908, the city council passed an ordinance authorizing the Calumet and South Chicago Railway Company to construct, maintain and operate a system of street railways in the city of Chicago upon substantially the same terms and conditions as were contained in the settlement ordinances, and that this ordinance was accepted by the Calumet and South Chicago Railway Company on June 1, 1908; that thereafter, on March 15, 1909, the city council passed an ordinance authorizing the Southern Street Railway Company to construct, maintain and operate a system of street railways in the city of Chicago upon substantially the same terms as contained in the settlement ordinances, which ordinance was accepted by the Southern Street Railway Company. The bill alleges that the settlement ordinances and the two subsequent ordinances above mentioned together embodied a plan for the comprehensive re-habilitation, construction, re-construction, equipment, re-equipment and extension of the street railway systems in the city, for the establishment of through routes, the exchange of transfers, the purchase of the surface lines by the city at some future time, the rates of fare to be charged, and the division of the net earnings of the railways between the city and the companies, and for the creation of a permanent expert supervising board. The bill further alleges that on November 13, 1913, the city council passed an ordinance authorizing and requiring unified operation of the surface street railways in the city of Chicago, which ordinance is commonly referred to as the "unification ordinance;" that the four companies above men-

tioned accepted this ordinance, and in compliance therewith entered into an operating agreement in the form prescribed by the unification ordinance.

The bill alleges that the ordinances above mentioned constitute valid and binding contracts between the city of Chicago and the respective street railway companies, and charges that the order of the commission, and the Public Utilities act in so far as it purports to confer upon the State Public Utilities Commission power and authority to make such order, impair the obligation of such contracts and de-prive the city of property without due process of law, take the city's private property without compensation, deny the city the equal protection of the laws, and deprive the city of the jurisdiction and control conferred upon it by the constitution over the street railways within the city, con-trary to and in violation of sections 2, 5, 13, 14 and 19 of article 2 and section 4 of article 11 of the State con-stitution, and of section 10 of article 1 and the fourteenth amendment of the constitution of the United States, and that the order is *ultra vires* because the Public Utilities act, properly construed, does not deprive the city of the power, authority and control vested in it by the constitution and statutes of the State over its streets and over the construc-tion and operation of street railways therein.

The Chicago City Railway Company, the Chicago Rail-ways Company, the Calumet and South Chicago Railway Company and the Southern Street Railway Company, de-fendants, after answering the bill, filed a cross-bill seeking the same relief as that sought by the original bill. The cross-bill is substantially the same as the original bill, ex-cept it sets out in detail a history of the development of the present system of street railways in the city of Chicago. The additional matters contained in the cross-bill, as well as the provisions of the settlement ordinances and the uni-fication ordinance, are fully set forth in the opinions filed in *Chicago Union Traction Co.* v. *City of Chicago*, 199 Ill.

484, *Venner* v. *Chicago City Railway Co.* 236 id. 349, *Venner* v. *Chicago City Railway Co.* 258 id. 523, *People* v. *Chicago Railways Co.* 270 id. 87, *People* v. *City of Chicago,* 270 id. 188, and *People* v. *Chicago Railways Co.* 270 id. 278. It is therefore unnecessary to set them out in detail in this opinion. It will here suffice to briefly mention certain provisions of the settlement ordinances and the unification ordinance.

The settlement ordinances granted to the street railway companies permission and authority to construct, reconstruct, maintain and operate a system of street railways upon and along certain streets in the city of Chicago for a period of twenty years, subject to the terms, provisions and conditions of the ordinances, and in consideration thereof the street railway companies surrendered and released all rights in the streets of the city other than those granted by the settlement ordinances. The settlement ordinances created a board of supervising engineers, to consist of three members,—one to be appointed by the city and one by the street railway companies and the third member was designated by name in the ordinances,—and provided that all construction, re-construction, equipment, re-equipment, extensions and additions should be done, made and acquired under the direction and supervision of the board of supervising engineers and that all contracts and payments therefor should be made only upon the written approval of said board; that the cars to be thereafter acquired by the railway companies should be of the number, character and equipment specified in the settlement ordinances, and of a finish, style and type approved by the board of supervising engineers. The settlement ordinances prohibited the use of trailers, fixed the rates of fare to be charged, provided for the issuance and exchange of transfers, and prohibited the issuance of passes to persons other than employees of the companies and certain officers of the city. The companies were required to co-operate in establishing specified through

routes and such additional through routes as should be required by the board of supervising engineers. They were also required to sprinkle, clean, pave and keep in repair the portions of the streets occupied by them; to provide reserve funds for maintenance and repair and for renewals and depreciation, and to expend therefrom and for such purposes a specified minimum amount each year, subject to the direction and control of the board of supervising engineers. The board of supervising engineers was given power to regulate the salaries and compensation of directors, officers, agents and attorneys of the companies. The city reserved the right to purchase, on the first day of February or August of any year, upon six months' previous notice, the entire street railway system of the companies at a price to be fixed in accordance with the method prescribed by the ordinance, viz.: The purchasable value of the property as of a certain date was fixed by the ordinance, and, in determining the price to be paid by the city when it exercised its option of purchase, there was to be added to the purchasable value so fixed, the value of all property, equipment and additions subsequently supplied, purchased or acquired and all future capital expenditures as approved and certified by the board of supervising engineers. The city also reserved the right, within the terms of the grant, to designate another corporation as its licensee to purchase the property upon the same terms, with the proviso that a bonus of twenty per cent should be paid unless the new company should enter into a contract to turn over to the city, directly or in reduced fares, all net proceeds over and above five per cent upon its investment and interest thereon at a rate not exceeding an additional five per cent. It was further provided that the net receipts of the companies, as defined in the ordinances, should be divided between the city and the companies in the proportions of fifty-five per cent to the city and forty-five per cent to the companies, provided, however, that the companies should have the right to charge

and receive the fares fixed by the settlement ordinances. In each of the settlement ordinances the city reserved the right to make all reasonable regulations for the safety, welfare and accommodation of the public.

By the unification ordinance the street railway companies were required to furnish unified traction service within the limits of the city of Chicago, the same and with like effect as though all the surface lines within the city were owned and operated by one company. This ordinance provided for the through routing of cars, the elimination of switch-backs in the down-town district, the substitution of loops or transfer stations for switch-backs in the outlying districts when so ordered by the city council and approved by the board of supervising engineers, and required the companies to furnish to the board of supervising engineers operating schedules and other details relating to the operation of their lines. It also required the companies to purchase a sufficient number of additional cars to utilize at all hours the additional track facilities in the down-town district made available by the through routing of cars prescribed by the ordinance. The contract which the street railway companies were by the unification ordinance required to enter into is, in substance, set forth in *People* v. *City of Chicago, supra.*

The State Public Utilities Commission and the members thereof demurred to the original bill and cross-bill. The demurrers were overruled, and the commission and the members thereof having elected to stand by their demurrers, a decree was entered perpetually enjoining the enforcement of the order. From that decree the State Public Utilities Commission and the members thereof have prosecuted this appeal.

In support of the decree of the circuit court appellees contend, first, that the commission was without power to make the order complained of, because the constitution of this State, by section 4 of article 11, grants to cities the

exclusive power to regulate and control the operation of street railways upon their streets, and because section 10 of the Public Utilities act excludes from the operation of the act public utilities in which a city is interested, as the city of Chicago is interested in the street railways of the city of Chicago; second, that the order of the commission deprives the railway companies and the city of property without due process of law, in violation of section 2 of article 2 of the State constitution and in violation of the fourteenth amendment of the Federal constitution; third, that the order of the commission takes and damages the private property of the railway companies and of the city for public use without just compensation, in violation ·of section 13 of article 2 of the State constitution; and fourth, that the order of the commission, and the Public Utilities act in so far as it empowers the commission to make the order, impair the obligation of contracts existing between the city and the railway companies and bondholders of the railway companies, in violation of section 14 of article 2 of the State constitution.

Section 4 of article 11 of our constitution provides that "no law shall be passed by the General Assembly granting the right to construct and operate a street railroad within any city, town or incorporated village, without requiring the consent of the local authorities having the control of the street or highway proposed to be occupied by such street railroad;" and in *Venner* v. *Chicago City Railway Co.* 258 Ill. 523, and again in *People* v. *City of Chicago, supra,* we said that "the constitution commits to the city the control of the operation of street railways in its streets." It is upon this section of the constitution and this statement contained in the two cases above cited that appellees rely in support of their contention that the commission was without power to make the order complained of, because the constitution grants to the city the exclusive power to regulate and control the operation of street railways upon the streets

of the city. In the recent case of *State Public Utilities Com.* v. *Chicago and West Towns Railway Co.* 275 Ill. 555, in considering the same contention here made, we said with reference to the constitutional provision above quoted (p. 570) : "That provision is simply a limitation of the general powers of the legislature, and in one particular, only. It provides, in substance, that the legislature may not grant the right to construct and operate a street railroad within a municipality without requiring the consent of the local authorities having control of the streets or highways proposed to be occupied. That section of the constitution does not, by implication or otherwise, attempt to divest the State of its paramount authority and control of streets and highways,"—citing *Chicago and Southern Traction Co.* v. *Illinois Central Railroad Co.* 246 Ill. 146. The statement made in *Venner* v. *Chicago City Railway Co. supra,* and in *People* v. *City of Chicago, supra,* that the constitution commits to the city the control of the operation of street railways in its streets, merely means that the constitution has conferred upon the city power to determine whether street railways shall be operated upon the streets of the city, and if so, upon what streets. To this extent, and no further, the constitution has committed to the city the control of the operation of street railways in its streets.

Section 10 of the Public Utilities act provides that the term "public utility," when used in the act, "means and includes every corporation, company, association, joint stock company or association, firm, partnership or individual, their lessees, trustees, or receivers appointed by any court whatsoever (except, however, such public utilities as are or may hereafter be owned or operated by any municipality) that now or hereafter : (*a*) May own, control, operate or manage, within the State, directly or indirectly for public use, any plant, equipment or property used or to be used for or in connection with the transportation of persons; * * * or that (*b*) may own or control any franchise,

license, permit or right to engage in any such business."
Appellees contend that the street railways in the city of
Chicago are within the exception contained in the above
statutory definition of a public utility, and are therefore not
within the provisions of the act nor under the jurisdiction
or control of the commission, because the city has secured
a vested right for the purchase of these railways and a
vested right to participate in the management and operation
thereof. In our opinion the language of section 10 relied
upon by the appellees can only be reasonably construed to
mean that public utilities owned or operated by municipali-
ties when the act became effective should not be subject to
the provisions of the act, and that thereafter, as soon as a
municipality should become the owner or take over the op-
eration of a public utility, such public utility should thereby
be withdrawn from the operation of the act. Although the
city of Chicago has by contract obtained an option to pur-
chase the street railways in the city at a price agreed upon
and has been given a voice in the management of the affairs
of the street railway companies, it has not yet become the
owner of the street railway properties, nor can it be said
that the operation of the street railway system has been
turned over to the city. The street railways of the city of
Chicago are clearly within the provisions of the act which
give the commission power to make the order involved in
this case.

The principal ground relied upon by appellees in sup-
port of the decree of the circuit court is, that the order of
the commission, and the Public Utilities act in so far as it
purports to confer upon the commission power to make the
order, deprive the railway companies and the city of prop-
erty without due process of law, take and damage the pri-
vate property of the railway companies and the city for
public use without just compensation, and impair the obli-
gation of contracts theretofore made between the city and
the railway companies, in violation of the provisions of the

State and Federal constitutions. It is our judgment that the order is not subject to the constitutional objections urged against it. The power of the legislature to exercise reasonable regulation and control over public utilities was upheld by this court, shortly after the adoption of our present constitution, in *Munn* v. *People,* 69 Ill. 80, where it was held that such regulation was not in violation of either section 2 of article 2, section 13 of article 2 or section 22 of article 4 of the State constitution nor in contravention of the fourteenth amendment of the United States constitution. That case was reviewed by the Supreme Court of the United States and the judgment was affirmed. (*Munn* v. *Illinois,* 94 U. S. [4 Otto,] 126.) The Supreme Court of the United States in its opinion said: "When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use he must submit to the control." This decision has become one of the landmarks of American law, and has been frequently cited, followed and approved in applying the rule that when private property is devoted to a public use it is subject to public regulation. *Chicago Dock Co.* v. *Garrity,* 115 Ill. 155; *State Public Utilities Com.* v. *Monarch Refrigerating Co.* 267 id. 528.

The regulation of public utilities is one phase of the exercise of the police power of the State. The police power may be exercised by the legislature directly, or it may be exercised indirectly by conferring the power upon agencies created by the legislature. The power is an attribute of sovereignty and is primarily vested in the legislature, which has the right to recall it at any time from the agency to which it has been delegated and after being recalled to retain it or confer it upon some other agency of government.

In the exercise of this power the State may interfere whenever the public interests demand such interference, and in this particular a large discretion is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. (*Durand* v. *Dyson*, 271 Ill. 382.) In *Illinois Central Railroad Co.* v. *Willenborg*, 117 Ill. 203, it was said: "All property devoted to public uses takes on a nature or qualification *quasi* public, and is for that reason held to be subject to legislative control in a greater or less degree and to which the mere private property of the citizen is not subjected. Rights purely and exclusively private, in nowise affecting others and in no way affecting public morals, are not regarded as being within the control of the police power; nor can mere private property be taken for public uses without making to the owner just compensation; yet the law has always required the citizen to so use his property as not unnecessarily to injure another, and to compel the observance of that rule even private property may be brought within legislative control to that extent. But where property, whether belonging to a natural person or to a corporation, becomes 'affected with a public interest it ceases to be *juris privati,* only.' Where a party devotes his property to a public use, the community at large acquire such a qualified interest as will subject it to legislative control for the common welfare. Accordingly the property of railroads, and other similar corporations transacting business for and with the public, has been subjected to burdens not imposed on the owners of mere private property, used purely and exclusively for private interests. The distinctions in this regard have been uniformly observed." Again, in *Burdick* v. *People,* 149 Ill. 600, we said: "The business of a common carrier is a public employment. The franchises of railroads, acting under charters or acts of incorporation, are of a public nature so far as the safety, convenience and comfort of passengers are concerned. Rea-

sonable regulations affecting the conduct of such public employments are fit subjects for legislative action. The lawmaking power may provide means for remedying such evils as in its opinion may exist in the management of these public agencies of transportation, and in doing so it may sometimes impose restrictions which are deemed to be necessary upon the use and enjoyment of property." A more concrete statement of the law as applied to the facts in this case is contained in *City of Chicago* v. *Chicago City Railway Co.* 272 Ill. 245, as follows: "The police power may be exercised in a variety of ways in the regulation of street car traffic for the public safety or convenience, such as providing against the overcrowding of cars, compelling proper seating facilities, specifying the side of the street at which stops shall be made, and any other matter which shall promote the public safety, comfort or convenience."

A rightful exercise of the police power is not a violation of any of the provisions of the constitution upon which appellees rely; (*Munn* v. *People, supra; Burdick* v. *People, supra; People* v. *Weiner,* 271 Ill. 74; *Durand* v. *Dyson, supra; Greene* v. *Fish Furniture Co.* 272 Ill. 148;) and statutes affecting the owners of public utilities by lessening their privileges, regulating their charges and increasing their burdens, within reasonable bounds, are uniformly held valid. *City of Chicago* v. *Town of Cicero,* 210 Ill. 290.

Appellees contend, however, that the settlement ordinances and the unification ordinance, having been accepted and acted upon by the railway companies, constitute binding contracts between the city and the railway companies, and that their obligation cannot be impaired by any act of the legislature or by any order of the State Public Utilities Commission. Appellees' contention is undoubtedly sound so far as the contracts relate to matters which do not affect the public safety, welfare, comfort or convenience. Thus, the grant of the right to the railway companies to construct and operate street railways in the city, the agree-

ment to divide the net receipts between the railway companies and the city and the option given to the city to purchase the railway properties at a certain price are all matters which do not affect the public safety, welfare, comfort or convenience, because it is immaterial to the public what person or corporation operates the street railways or what disposition is made of the profits, and over those matters neither the State nor the State Public Utilities Commission has any control by virtue of the police power. Nor has the commission by the order here complained of assumed to exercise control over any such matters. The order requires only such things to be done by the railway companies as will, in the judgment of the commission, improve the service furnished the public, and in so far as the order conflicts with the ordinances concerning such matters the order of the commission supersedes and sets aside the provisions of the ordinances, but does not, within the meaning of the constitutional prohibition, impair the obligation of any contract, because the city had no power to contract away any of the police powers delegated to it by the legislature. In City of Chicago v. Chicago Union Traction Co. 199 Ill. 259, we said: "The city, as the representative of the State, is invested with power to enact and enforce all ordinances necessary to prescribe regulations and restrictions needful for the preservation of the health, safety and comfort of the people. The exercise of this power affects the public and becomes a duty, the performance whereof is obligatory on the city. The city could not, by the terms and conditions of the former ordinance, deprive itself of this power or relieve itself of this duty, nor could the defendant in error company, by any contractual terms of an ordinance, exempt itself from the proper and reasonable control of the municipal authorities in matters affecting the health, safety or comfort of the people. 'No contract can be made which assumes to surrender or alienate a strictly governmental power which is required to continue in existence for the

welfare of the public. This is especially true of the police power, for it is incapable of alienation. It cannot be doubted that a company which secures the right to use the streets of a municipal corporation takes it subject to the police power resident in the State as an inalienable attribute of sovereignty.'—Elliott on Roads and Streets, p. 801." Again, in Otis Elevator Co. v. City of Chicago, 263 Ill. 419, referring to the police power, we said: "But the power is incapable of alienation, and no valid contract can be made which assumes to surrender or alienate such a power which is required to continue in existence for the welfare of the public." The principle is again recognized in City of Chicago v. Chicago City Railway Co. supra, in the following language: "It is true that a municipality cannot contract away the right to exercise the police power to secure and protect the morals, safety, health, order, comfort or welfare of the public nor limit or restrain by any agreement the full exercise of that power." We have accordingly held that a city cannot contract away its right, under the police power, to fix reasonable rates to be charged by a public utility furnishing water to the city and its inhabitants. Rogers Park Water Co. v. Fergus, 178 Ill. 571; City of Danville v. Danville Water Co. 178 id. 299; Freeport Water Co. v. City of Freeport, 186 id. 179.

If the city of Chicago, in entering into the contracts with the railway companies, has seen fit to make its option to purchase the street railway system, or its right to a certain portion of the net reecipts derived from the operation of the system, or any other rights reserved to it by the ordinances, dependent upon the non-exercise of the police power by the State, it cannot be heard to complain that by the exercise of the police power by the State, through the State Public Utilities Commission, it will lose its right to those benefits reserved to it by the ordinances.

Appellees contend that the order is unreasonable and that the commission should therefore be enjoined from en-

forcing it. The question of the reasonableness of the order cannot be determined in this proceeding. The Public Utilities act provides for a hearing before the commission upon that question, at which the person or corporation complained of is entitled to be heard and to introduce evidence, and if such person or corporation desires to contest the reasonableness of the order made by the commission after such hearing, he or it is by the act allowed an appeal to the circuit court of Sangamon county and a further appeal to this court. The statutory method of reviewing the reasonableness of orders of the commission is exclusive.

It is also urged that as the Calumet and South Chicago Railway Company, the Southern Street Railway Company and the city of Chicago were not made formal parties to the proceedings before the commission, those proceedings, so far as they are concerned, were *ex parte,* and the order amounts to a taking of their property without due process of law. Even though the two railway companies last mentioned and the city were not made parties to the proceedings before the commission they were not thereby deprived of a hearing before the commission. Section 67 of the Public Utilities act provides: "After any rule, regulation, order or decision has been made by the commission, any party to the action or proceeding, or any stockholder or bondholder or other party pecuniarily interested in the public utility affected, may apply for a rehearing in respect to any matters determined in said action or proceeding and specified in the application for rehearing, and the commission may grant and hold such rehearing on said matters, if in its judgment sufficient reason therefor be made to appear." The provision for a review of the decision of the commission upon the rehearing is the same as the provision for review of the original order. None of the appellees have, therefore, been deprived of a hearing upon the reasonableness of the order made by the commission and have not been deprived of property without due process of law.

The matters set up in the bill and cross-bill were not sufficient to warrant the court in granting an injunction restraining the enforcement of the order of the commission, and the demurrers to the bill and cross-bill should therefore have been sustained.

The decree is reversed and the cause is remanded to the circuit court, with directions to sustain the demurrers to the bill and cross-bill.

<em>Reversed and remanded, with directions.</em>

Mr. JUSTICE CARTER, dissenting.