(No. 18019.—Judgment reversed and order confirmed.)
The Illinois Commerce Commission *ex rel.* The Illinois
Traction, Inc., Appellant, *vs.* Omphghent Township
*et al.* Appellees.

*Opinion filed April 20, 1927—Rehearing denied June 9, 1927.*

1. Public utilities—*Commerce Commission has control over railroad crossings of highways.* The control of railroad crossings of public highways has been by law conferred upon the Commerce Commission as successor to the Public Utilities Commission, and a highway commissioner has no particular duty to perform in regard to such crossings.

2. Same—*the Public Utilities act is an exercise of police power.* The Public Utilities act was passed by the General Assembly in its exercise of the police power.

3. Same—*franchises, contracts and ordinances are subject to regulatory powers of Commerce Commission.* Neither franchise ordinances of cities, (which ordinances have been accepted and acted upon by grantee utility companies,) regulatory ordinances of cities under legislative authority, nor private contracts, can stand in the way of the lawful exercise by the Commerce Commission of regulatory powers conferred upon it by law.

4. Same—*jurisdiction of courts in reviewing orders of Commerce Commission.* Orders of the commission can be set aside only when arbitrary, unreasonable or in clear violation of some rule of law or of some constitutional right.

5. Police power—*contracts are subject to statutes properly exercising police power.* The police power is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and all contracts, whether made by the State itself, by municipal corporations or by individuals, are subject to be interfered with or otherwise affected by subsequent statutes enacted in the *bona fide* exercise of the police power, and do not, by reason of the contract clause of the Federal or State constitution, enjoy any immunity from such legislation.

Appeal from the Circuit Court of Madison county; the Hon. Louis Bernreuter, Judge, presiding.

James A. Knowlton, for appellant.

326—5

ROBERT FERDINAND TUNNELL, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

On August 10, 1925, the Illinois Traction, Inc., (hereinafter referred to as appellant,) filed an application with the Illinois Commerce Commission requesting the approval of the installation and use of electric duplex flashing light signals for the protection of a grade crossing located in a subway where its main line electric railway track crosses a certain public highway about one-half mile south of the village of Worden, in Omphghent township, Madison county, Illinois.    A hearing was had before the commission in March, 1926, at which the highway commissioner of that township appeared as an objector, and in April, 1926, the commission entered an order approving the installation of the automatic electric signals and authorizing the operation of appellant's trains over the grade crossing without stopping and at a rate of speed not to exceed four miles per hour.    The order further required that all trains should be operated over this grade crossing under full control and be prepared to stop within the line of vision.    The commissioner of highways made application for rehearing, which was denied, and thereafter he prosecuted an appeal to the circuit court of Madison county, where the order of the Commerce Commission was reversed.    From that judgment this appeal has been prosecuted by the Illinois Traction, Inc.

From the application and the proof presented to the commission it appears that the highway is an unimproved dirt road leading south from the village of Worden.    Some years ago, when the Cleveland, Cincinnati, Chicago and St. Louis railway was constructed through that vicinity, the tracks of that railway were elevated upon a dirt embankment in order to avoid certain grade crossings with other railroads, and a concrete arch or subway about

twenty-four feet in width was built over this highway, thereby permitting vehicular traffic to pass under or through the railroad embankment. The predecessor of appellant about the year 1905 surveyed and located its line of railroad through the village of Worden and thence in a southerly direction through Omphghent township toward the city of Edwardsville. The electric railroad was located so as to pass through the arch or subway of said railroad embankment, and by so doing crossed the highway at grade in, and about the middle of, the subway. At that time an agreement was made with the highway commissioners of the township whereby the electric railroad was permitted to go through the subway and to cross the public highway at that point, appellant's predecessor agreeing to pay a portion of the original cost of the subway, and further agreeing to stop all of its trains and flag the same over the crossing and through the subway. The single track railroad of appellant's predecessor was constructed through this subway and trains have been operated in accordance with the agreement just mentioned until the early part of 1926. The railroad embankment extends in a southwesterly direction through the township. The public road runs approximately north and south, and extends through the subway at an angle of about seventy degrees. The traction railroad approaches the subway from the northwest and extends practically through the center of it. There is not clearance space for a vehicle on either side of the track when an interurban car or train is passing through the subway. It further appears that the highway in question was used rather extensively at the time the electric railroad was constructed, but that at the present time one of the State paved roads, extending generally from East St. Louis toward Springfield and passing through Edwardsville, passes about one and a half miles east of the village of Worden. Another local highway extending east from that village has been improved and connects with the paved State highway.

Since the construction of these improved roads they are used during all seasons of the year by automobiles and other vehicles, and are the preferred routes for persons traveling either in a north or south direction from the village of Worden. The use of the improved roads, however, for traffic going south or coming from that direction, makes the distance about two miles longer than by using the unimproved dirt road here in question. This unimproved road is used to some extent during the summer months by farmers living immediately south of the subway for the purpose of hauling grain and other produce to the village of Worden, and during the entire year the road is used to some extent. When the weather is good and the road dry it is used as a short cut in going to and from the village. It appears that a check was made of the number of vehicles using this road during one week in March, 1926, and the result of that check showed an average of six vehicles per day passing through the subway. The record also shows appellant endeavored to secure the consent of the highway commissioner of Omphghent township to the installation of the type of flashing light signals but without success, and that thereafter appellant installed the signals and proceeded to operate them. The installation was complete at the time of the hearing before the commission. One of the automatic signals was installed near the highway on each side of the entrance to the subway. The method of operation was, that the signal located on the south side of the subway would start to flash when a car or train approaching from the north reached a point about 1200 feet from that signal, and the signal installed on the north side of the subway would begin to flash when a car or train approaching from the south reached a point about the same distance from that signal. The signals were standard installation and in use at other grade crossings. Just south of the subway crossing there is a sharp curve in the line of appellant's railroad, and just north of the

subway there is a grade crossing with another railroad. These conditions make a slowing of speed necessary at these points. The investigation made under authority of the commission by its assistant railroad engineer was reported at the hearing, and showed that a traveler by vehicle approaching from the south and going in a northerly direction toward the subway crossing must be at a point approximately 33 feet from the center line of the crossing (at which point the clearance between the side of an interurban car and a vehicle is approximately six feet) before he can observe a train or interurban car approaching from the north. At such point he could see approximately 400 feet of railroad track to the north, and by looking behind him he could see 800 feet of track to the south. A traveler going in a southerly direction and approaching the subway crossing from the north must be about 65 feet from the crossing (at which point there is a clearance of approximately 14 feet between an interurban car and a vehicle) before he can see a train or interurban car approaching from the south. At such point he has a view of approximately 400 feet of railway track to the south, and by looking behind him he could see about 700 feet of track toward the north. It was further shown that the Illinois Traction operates on schedule about thirty-eight trains each way daily, and approximately eight freight trains each way daily and which are not run on schedule. There was proof showing that the stopping of the trains and the flagging of them through the subway prior to the installation of the automatic electric signals caused additional burden and unnecessary delay to railroad traffic.

The commission found that vehicular traffic over the crossing in question is very light, and that on account of the small amount of highway traffic over the crossing, and by reason of the installation of the automatic signals by appellant, the danger at the grade crossing has been practically eliminated, and in its order, as previously stated, it

approved the installation of the automatic electric flashing signals and authorized the operation of trains by appellant through the subway and over the highway crossing without stopping, but required that all trains should be operated under full control and at a speed not to exceed four miles per hour.

The specific ground upon which the reversal of the order of the Commerce Commission was based does not appear from the judgment of the circuit court.

It is the contention of appellees that the conditions at the grade crossing are such that the absolute stopping of all trains and the flagging thereof through the subway, as was done prior to the installation of the automatic electric signals, are absolutely necessary in order to safeguard the crossing. It is also contended by appellees' counsel that the action of the Commerce Commission impaired the obligation of the contract made in 1905 by appellant's predecessor and the highway commissioner.

Prior to the enactment of the Public Utilities act in 1913, and by virtue of paragraph 5 of section 19 of the Railroad Incorporation act, every corporation formed under the latter act was authorized to construct its railroad across any highway which its route intersected, subject to the duty of restoring the highway to its former state or to such condition as not unnecessarily to have impaired its usefulness. This was an absolute grant of power by the State to a railroad company to construct its road across any highway and no consent of the highway commissioners was necessary or required except where such railroad was to be built along,—that is, lengthwise of,—the highway. (*County of Cook* v. *Great Western Railroad Co.* 119 Ill. 218.) Since the passage of the Public Utilities act a highway commissioner has no particular duty to perform in regard to railroad crossings. The control of railroad crossings has been by law conferred upon the Commerce Commission as successor to the Public Utilities Commission.

(*Stephens* v. *Chicago, Burlington and Quincy Railroad Co.* 303 Ill. 49; *Public Utilities Com.* v. *Smith*, 298 id. 151; Smith's Stat. 1925, chap. 111⅔, secs. 57, 58, p. 2010.) The Public Utilities act was passed by the General Assembly in its exercise of the police power. (*City of Chicago* v. *O'Connell*, 278 Ill. 591.) This power is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people and is paramount to any rights under contracts between individuals. All contracts, whether made by the State itself, by municipal corporations or by individuals, are subject to be interfered with or otherwise affected by subsequent statutes enacted in the *bona fide* exercise of the police power, and do not, by reason of the contract clause of the Federal or State constitution, enjoy any immunity from such legislation. (*Hite* v. *Cincinnati, Indianapolis and Western Railroad Co.* 284 Ill. 297.) We have held that neither franchise ordinances of cities which have been accepted and acted upon by grantee utility companies, regulatory ordinances of cities under legislative authority, nor private contracts, have been permitted to stand in the way of the lawful exercise by the Commerce Commission of regulatory powers conferred upon it by law. *City of Chicago* v. *O'Connell, supra; Hite* v. *Cincinnati, Indianapolis and Western Railroad Co. supra; Village of Atwood* v. *Cincinnati, Indianapolis and Western Railroad Co.* 316 Ill. 425; *Northern Trust Co.* v. *Chicago Railways Co.* 318 id. 402.

It is unnecessary for us to discuss in detail the evidence offered before the commission. Three of the witnesses for appellees considered the crossing a dangerous one, and from our examination of the exhibits in the record we are of like opinion. However, the commission did not act in the matter without having its own railroad engineer make an investigation and report upon the conditions existing at this grade crossing. Orders of the commission are entitled to

great weight, and can only be set aside if arbitrary, unreasonable or in clear violation of some rule of law. Courts should review or interfere with such orders only so far as necessary to keep them within the jurisdiction of the commission and to protect constitutional rights. The Public Utilities act does not contemplate, and the law does not authorize, a court to put itself in the place of the commission and try a question presented to the commission a second time and thereafter substitute its own judgment for that of the commission. No court should attempt to usurp legislative or administrative functions by setting aside a legislative or administrative order on its own conception of the wisdom of it. The orders and decisions of the commission are subject to review as to the reasonableness of the commission's conclusion, and an unreasonable order is unlawful. However, where there is substantial evidence to warrant it, an order of the commission should be sustained. *Public Utilities Com.* v. *Chicago, Milwaukee and St. Paul Railway Co.* 287 Ill. 412; *Public Utilities Com.* v. *Smith, supra; Wabash, Chester and Western Railroad Co.* v. *Commerce Com.* 309 Ill. 412.

The order entered by the Commerce Commission in this case involved the proper protection of a railway grade crossing and the regulation of the operation of appellant's trains over its track at that point. This was a matter over which the commission had jurisdiction and the conclusion reached by it was warranted by the evidence presented.

The judgment of the circuit court is reversed and the order of the Commerce Commission is hereby confirmed.

*Judgment reversed.*

*Order of Commerce Commission confirmed.*