## Mary Ludolph, et al., Executors, etc., v. Chicago & Northwestern Railway Company.

### Gen. No. 11,292.

1. CONTRIBUTORY NEGLIGENCE—*when person guilty of, in crossing railroad tracks.* A person is guilty of contributory negligence in attempting to cross railroad tracks after being warned of his danger, and while the crossing gates are down.

2. CROSSING GATES—*what, notice of when down.* When railroad crossing gates are lowered where two or more tracks are crossed by a street, they are a signal not merely of the use of the crossing by one train, but by all trains that may then approach and desire to pass; and no one is justified, so long as the gates remain down no longer than a reasonable time, to cross over on the supposition that another train will not pass over.

Action on the case for death caused by alleged wrongful act. Error to the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1903. Affirmed. Opinion filed October 4, 1904.

THEODORE G. CASE and JOHN T. MURRAY, for plaintiffs in error; A. W. BROWNE, of counsel.

A. W. PULVER, for defendant in error; S. A. LYNDE and LLOYD W. BOWERS, of counsel.

MR. PRESIDING JUSTICE STEIN delivered the opinion of the court.

This is an action brought by plaintiffs in error as execu-

tors of the estate of Henry Ludolph, deceased, to recover
damages from defendant in error for its alleged negligent
killing of said Ludolph. After all the evidence offered by
both sides had been heard, the jury found the defendant
not guilty under the court's instruction to that effect.
Judgment was rendered on the verdict, and plaintiffs have
sued out this writ of error. Of the errors assigned the
only one argued is that the court erred in giving the per-
emptory instruction to find for the defendant. The in-
struction is sought to be justified, both because deceased
was guilty of contributory negligence and because the
proof showed no negligence on the part of the defendant.

The deceased came to his death November 8, 1897, at
about 6:40 P. M., at the point where Clybourn place, a street
in the city of Chicago, intersected at grade the tracks of
defendant, and almost directly where the two main tracks,
respectively, of the Milwaukee division and the Wisconsin
division of defendant's line join and proceed southerly into
the city as one double track line. Six tracks crossed the
street in a northerly and southerly direction. The street
ran nearly east and west. Counting from the west there
was first a side track; next, the two main tracks of the
Wisconsin division; then the two main tracks of the
Milwaukee division, and last another side track. The
tracks were enclosed by crossing gates which extended
both over the roadway and the sidewalks, and were oper-
ated by a man on the ground, who also acted as flagman.
At each of the four corners of the crossing and near the
gate posts were street gas lamps, which at the time of the
accident were lit. Trains on the tracks of the defendant
keep to the left, so that the north-bound track on the Wis-
consin division was the westernmost track of the two tracks
of that division, and the south-bound track of the Milwau-
kee division was the easternmost track of the four main
tracks.

Just before the accident the gateman, William Wend-
land, let down the crossing gates upon the approach on the
Wisconsin division of a north-bound train known as the

Northwestern Limited.  At this time he saw a train on the Milwaukee division, called the Kenosha train, which was then about a quarter of a mile north of the crossing.  The Northwestern Limited was going north on the western-most track of the four main tracks, and the Kenosha train was going south on the easternmost track of the four main tracks.  After letting the gates down the gateman went over the east main track and stood there, and according to his uncontradicted testimony there was then nobody on the crossing excepting himself.  A moment or two afterwards he saw a man standing at the southwest corner of the crossing near the lamp post.  One McCarthy was the only witness of the plaintiffs as to the happening of the accident. He did not come to the crossing until the gates were already down, and then saw Ludolph, the deceased, standing near a telegraph pole at the southwest corner of the cross-ing, a couple of feet inside of the gates, McCarthy himself being outside of them behind Ludolph, about eight or ten feet from him.  As soon as the limited train began to pass off the crossing towards the north, Ludolph started east-wardly across the same.  The gates, however, remained down and McCarthy continued standing outside of them, the Kenosha train being in plain sight coming south.  As the limited train was leaving the crossing the flag or gate-man, being afraid, as he testified, that people might step through the gates and go in front of the other train, changed his position from where he stood near the first track over across the south-bound track and between the two tracks upon which the two trains were moving.  He had a lantern in his hand as he ran across, and was seen doing so by the engineer and fireman of the Kenosha train, by the towerman of an interlocking plant, just south of the crossing, and by another witness, an outsider.  McCarthy testified, not that there was no flagman at the crossing, but that he did not see one there.  Before the trial, however, he had signed and sworn to a written statement read by him before signing that he did see a flagman at the crossing. The flagman testified that as he ran across the south-

242 APPELLATE COURTS OF ILLINOIS.

bound track he swung his lantern so as to give notice of the approach of a train, and then continued : "And then I saw a man coming behind the St. Paul and Duluth Limited, coming across the south side-track, and he had a big rain coat, and a big slop hat on his head; and I hollered to him, 'Stop, you can't come across no more; the train is coming; you will get killed!' and give motion with my lantern again to stop. And I saw he did not pay attention to me at all, and the train was close by my shanty already. Then I had a chance to jump over and try to hold him back. I jumped over and caught his arm a little with my left hand and said : 'Mister, stop now, you can't get through now. You will get killed;' and then he said to me, 'You ain't a police officer,' or 'an officer,' I can't say just what; and he pushed me away, and he walked straight ahead and did not stop at all; went right straight ahead and walked straight to the cow catcher, not in front, but on the side—on the west side of the cow catcher, and rolled him right down. The train was whistling hard and was slacking down, and then he was laying across from the brewery, and the patrol wagon came and picked him up."

The testimony on this point of the engineer of the train going south was as follows:

"Their (the Limited's) hind car was just clearing the crossing as I struck it. Well, at the time we run across my attention was drawn to him (the flagman) from the fact of his running over with that lantern in his hand, and I saw the party as soon as the coach cleared on its north-bound track. He started to cross; he appeared to be in a hurry; and this man with the lantern, that I afterwards found was, as soon as I took a second to think, was the flagman, he threw his hand up like that to the party who was going across, and he up and around him, and started over to the street planking, over to the foot-walk. And then it appeared to be that he had misjudged the moving of the train, or that the train would stop, or was fully determined to go right around that train; that he started in a diagonal

way across, or kind of circle like around, and disappeared from view for the time being. When I saw him go around in front of the engine I put on the air brake; when I put on the air brake the engine had got—perhaps the point of the pilot was fifteen or twenty feet from the crossing at that time over the sidewalk or walk part of the crossing. The flagman crossed the crossing on the run. When he came to where this man was going he was about midway between the two tracks; perhaps he had gone twenty to twenty-five feet west of me; yes, sir, west of the track I was on. \* \* \* When the watchman stepped in front of him he was on a run, in a hurry, like a man would be in a hurry."

The south-bound train which struck and killed Ludolph was traveling at the rate of not exceeding fourteen or fifteen miles an hour. It appears beyond all question that he had an unobstructed view of it as it approached the crossing, but that, nevertheless, and in spite of, and wholly disregarding the flagman's warning, both by signaling and shouting to him, he started across in front of the moving train. It had a bright headlight burning and the flagman saw it a quarter of a mile away.

The foregoing facts are practically uncontradicted, and they show such contributory negligence on the part of the deceased as to bar a recovery by the plaintiffs. When the gates were first lowered the flagman was the only person on the crossing; later on the deceased was seen standing two feet inside of the gates. It thus appears that when he came to the crossing the gates were down, and that he went around or under them in order to get where he stood while the north-bound train was passing. Not only were the gates down on both sides of the crossing, but they had green lights hanging from their ends in plain view of Ludolph, who stood within two feet of one, and with the east gate directly opposite and in front of him. Instead of remaining there, and without the gates going up, he started to go across as soon as the north-bound train was leaving the crossing, although the flagman told him he would be killed if he did so. There was nothing to indicate that the cross-

ing was clear, and everything to indicate that it was not. McCarthy, who stood a little away from Ludolph, acting like a man of ordinary prudence, did not attempt to cross the tracks while the gates were down, but remained where he was, in a place of safety. Had Ludolph done the same, or acted with anything like ordinary caution, his death would not have taken place.

When railroad crossing gates are lowered where two or more tracks are crossed by a street, they are a signal, not merely of the use of the crossing by one train, but by all trains that may then approach and desire to pass; and no one is justified, so long as the gates remain down no longer than a reasonable time, to cross over on the supposition that another train will not pass over. Douglas v. R. R. Co., 100 Wis. 405; Duvall v. R. R. Co., 105 Mich. 386; C., R. I. & P. R. R. Co. v. Fitzsimmons, 40 Ill. App. 360.

We can but repeat the language of this court in Bjork v. R. R. Co., 85 Ill. App. 269, as strikingly applicable to the case at bar: "Under these circumstances we think the conduct of appellant must be regarded as so clearly and palpably negligent that all reasonable minds would so pronounce it without hesitation and dissent. And where the court must say that but one reasonable inference can be drawn from the facts as to the negligence of the appellant, the court may, and should, direct a verdict accordingly." R. R. Co. v. Gormley, 108 Ill. App. 59; R. R. Co. v. Strampei, 110 id. 482.

In view of the contributory negligence of the deceased, we do not deem it necessary to discuss the question of defendant's negligence. Even if it was negligent, as charged, still plaintiffs cannot recover.

The judgment of the Circuit Court is affirmed.

*Affirmed.*