THE VILLAGE OF ATWOOD, Appellant, *vs.* THE CINCIN-
NATI, INDIANAPOLIS AND WESTERN RAILROAD COM-
PANY, Appellee.

*Opinion filed April 24, 1925.*

1. MUNICIPAL CORPORATIONS—*the Public Utilities act has taken from cities power to require watchmen at grade crossings.* By sections 57 and 58 of the Public Utilities act, authorizing the Commerce Commission to regulate railroad grade crossings and make provision for the safety of the public in regard thereto, the legislature has taken from cities and villages the power conferred by paragraph 27 of section 1 of article 5 of the Cities and Villages act to require railroad companies to keep flagmen at grade crossings, as the two statutory provisions are irreconcilable.

2. STATUTES—*later statute repeals former repugnant statute.* Repeals by implication are not favored, but where two statutes are clearly repugnant to each other the later one operates as a repeal of the former.

3. SAME—*new statute revising an entire subject must prevail.* Where the legislature enacts a new statute upon a certain subject and the intention appears from the act to be to frame a new scheme in relation to and to make a revision of the whole subject, there is, in effect, a legislative declaration that whatever is embraced in the new statute shall prevail over various provisions of the old law upon the subject.

4. POLICE POWER—*legislature may recall delegated police power.* The police power is an attribute of sovereignty and is primarily vested in the General Assembly, which has the right at any time to recall it from the agency to which it has been delegated and after being recalled to retain it or confer it upon some other agency of government.

5. SAME—*legislature has large discretion in exercise of police power in interest of public.* In the exercise of the police power the State may intervene whenever the public interests demand such interference, and in this respect a large discretion is necessarily vested in the legislature to determine not only what the interests of the public require but what measures are necessary for the protection of such interests.

FARMER, J., dissenting.

APPEAL from the Circuit Court of Piatt county; the Hon. GEORGE A. SENTEL, Judge, presiding.

WILLIAM K. WHITFIELD, W. THOMAS COLEMAN, and JESSE L. DECK, for appellant.

GEORGE B. GILLESPIE, GEORGE M. GILLESPIE, and THOS. E. GILLESPIE, (F. J. GOEBEL, of counsel,) for appellee.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

The president and board of trustees of the village of Atwood on February 13, 1922, passed an ordinance requiring the Cincinnati, Indianapolis and Western Railroad Company, within sixty days after notice of the passage and publication of the ordinance, to station and maintain a flagman at the intersection of County Line street with the railroad from eight o'clock in the morning until six o'clock in the afternoon of each day. The ordinance declared that such a flagman was necessary for the safety of the general public, and subjected the railroad company, for its refusal or neglect to comply, to a fine of not less than $10 for each day's default. The railroad company refused to provide the flagman, and the village brought suit in the circuit court of Piatt county to recover the penalties prescribed. The defendant interposed a demurrer to the declaration, assigning as causes therefor that the village authorities had no power or authority to pass the ordinance, and that the power to provide for the safety of the public at the intersections of streets with steam railroads is vested solely in the Commerce Commission. The court sustained the demurrer and rendered judgment in favor of the defendant. The village prosecutes this appeal since the validity of a municipal ordinance is involved, and the trial judge has certified that in his opinion the public interest requires that the appeal be taken directly to this court.

The sole question presented for determination is whether the president and board of trustees of the village of Atwood had the power to pass the ordinance. Sub-section 27

of section 1 of article 5 of "An act to provide for the incorporation of cities and villages," approved April 10, 1872, in force July 1, 1872, (Cahill's Stat. 1921, p. 447,) expressly confers upon cities and villages organized under the act the power "to require railroad companies to keep flagmen at railroad crossings of streets, and provide protection against injury to persons and property in the use of such railroads." This provision became a part of the act at the time of its passage and since has remained unchanged. Appellee does not deny this grant of power, but insists that it was the purpose of the General Assembly by the passage of "An act to provide for the regulation of public utilities," approved June 30, 1913, in force January 1, 1914, (Laws of 1913, p. 459,) to vest in the Public Utilities Commission, and by its successor, "An act concerning public utilities," approved June 29, 1921, in force July 1, 1921, (Laws of 1921, p. 702,) to vest in the Illinois Commerce Commission complete and exclusive power to regulate and control all public utilities in the State, and that such purpose is manifested by the terms and provisions of the two acts. A consideration of the scope and pertinent provisions of the later act is therefore necessary.

The act, among other things, creates the Commerce Commission and vests it with general supervision of all public utilities, including power to establish their systems of accounting, to supervise, regulate, restrict and control the issuance of their stocks and bonds, to regulate their rates and services, and to hold investigations, inquiries and hearings concerning any matters within the provisions of the act or any other act relating to public utilities, make findings and enter its orders thereon. More specifically, section 9 (Laws of 1921, p. 708,) requires every public utility to comply with every order or regulation made by the commission. Section 32 (Laws of 1921, p. 719,) requires every such utility to furnish and maintain such instrumentalities, equipment and facilities as shall promote the safety, health,

comfort and convenience of its patrons, employees and the public and as shall be in all respects adequate and efficient. The 49th section (Laws of 1921, p. 728,) provides that whenever the commission, after a hearing upon its own motion or upon complaint, shall find that the equipment, appliances, facilities or practices of any public utility are unsafe, improper or inadequate, the commission shall determine, and by its order, rule or regulation fix, the safe, proper or adequate equipment, appliances, facilities or methods to be observed, furnished, constructed, enforced or employed. By section 50 (Laws of 1921, p. 728,) whenever the commission, after a hearing upon its own motion or upon complaint, shall find that additions, extensions, repairs or improvements to or changes in the existing plant, equipment, apparatus, facilities or other physical property of any public utility ought reasonably to be made to promote the security or convenience of its employees or the public, the commission shall make and serve an order directing that such additions, extensions, repairs, improvements or changes be made. Section 57 (Laws of 1921, p. 733,) provides: "The commission shall have power, after a hearing and upon its own motion, or upon complaint, by general or special orders, rules or regulations, or otherwise, to require every public utility to maintain and operate its plant, equipment or other property in such manner as to promote and safeguard the health and safety of its employees, passengers, customers, and the public, and to this end to prescribe, among other things, the installation, use, maintenance and operation of appropriate safety or other devices or appliances including interlocking and other protective devices at grade crossings or junctions and block or other systems of signaling, to establish uniform or other standards of equipment, and to require the performance of any other act which the health or safety of its employees, passengers, customers or the public may demand." By section 58 (Laws of 1921, p. 734,) the commission is given power, after a hearing,

when in its opinion the public safety requires it, to alter or abolish any existing or future grade crossing or to require a separation of grades at such crossings, and to prescribe, after a hearing of the parties, the terms upon which such separation shall be made and the proportion in which the expense of the alteration or abolition of such crossings or the separation of such grades shall be divided between the railroad or street railroad companies affected, or between such companies and the State, county, municipality or other public authority in interest. Section 64 (Laws of 1921, p. 738,) authorizes the making of complaints by the commission upon its own motion, or by any person or corporation, chamber of commerce, board of trade, or any industrial, commercial, mercantile, agricultural or manufacturing society, or any body politic or municipal corporation. Section 65 (Laws of 1921, p. 740,) provides for the issuance of process to enforce the attendance of necessary witnesses, for hearings, the taking of evidence, the entry of orders and for appeals. Section 76 (Laws of 1921, p. 747,) subjects any public utility which violates or fails to comply with any provision of the act, or any order, decision, rule, regulation, direction or requirement of the commission, to a fine of not less than $500 nor more than $2000 for each and every offense. Sections 81 to 86 inclusive, (Laws of 1921, pp. 748-753,) which constitute article 6 of the act, concern local utilities, and permit a city which adopts the article, to regulate and control such public utilities, "except railroads constituting or used as a part of a trunk line railroad system," in the manner there prescribed.

It will be observed that every public utility is required by section 32, among other things, to provide and maintain such instrumentalities, equipment and facilities as shall promote the safety not only of its patrons and employees but also of the public. The act expressly provides for hearings by the commission concerning matters relating to public utilities and the making of rules, regulations, decisions or

orders as the result of such hearings. Public utilities are required by section 9 to obey such rules, regulations, decisions or orders, and the 76th section prescribes several penalties for failure to comply. The commission has the power, after a hearing, to determine safe, proper and adequate appliances and facilities and by its order to require them to be furnished, constructed or employed. If after a hearing it shall find that additions or improvements to or changes in any existing facilities or other physical property of any public utility ought reasonably to be made to promote the security of the public, it may by its order direct such additions, improvements or changes to be made. By section 57 the commission has the power, after a hearing, to require every public utility to maintain and operate its property in such manner as to promote and safeguard the safety of its employees, passengers and the public, and to that end may prescribe, among other things, the installation, use, maintenance and operation of appropriate safety or other devices or appliances at grade crossings, and to require the performance of any other act which the safety of its employees, passengers or the public may demand. Manifestly, under this section the commission may require railroads to station flagmen at grade crossings. To promote the public safety the commission may also, by section 58, after a hearing, alter or abolish grade crossings or require a separation of grades at such points, and may even fix or charge a portion of the expense of any such change upon the municipality affected. The provisions of the act to which reference has been made clearly show that the commission is charged with the duty, among others, of safeguarding and promoting the safety of the public at street intersections of railroads and that it is vested with plenary power to perform that duty.

The question then arises, Does the Public Utilities act, (Laws of 1921, p. 702,) by conferring this ample control and supervision over intersections of streets with railroads,

deprive municipalities organized under the general Cities and Villages act of the power to pass ordinances requiring railroad companies to keep flagmen at such crossings? The commission exercises its power after a hearing and its order is subject to review by judicial tribunals. The order must be obeyed by the public utility and its failure to do so will subject it to the penalties prescribed by the act. The authority conferred by sub-section 27 of section 1 of article 5 of the Cities and Villages act is exercised by the passage of an ordinance and no investigation of or hearing upon its subject matter is required. If both the commission and the village authorities can exercise the power, their requirements with reference to the same crossing may be utterly contradictory, for the village board may direct the stationing of a flagman while the commission may order a separation of grades. Obviously, in such cases both cannot be obeyed, and concurrent authority often leads to conflict and results in confusion. The Public Utilities act enjoins obedience to the commission's orders. That act is the later one and covers the whole subject of promoting the safety of the public at the intersections of streets and railroads. It is complete in itself and evidently was intended by the General Assembly to supersede the power conferred by subsection 27 of section 1 of article 5 of the general Cities and Villages act to require railroad companies to keep flagmen at street crossings. While repeals by implication are not favored, yet where two statutes are clearly repugnant to each other the later one operates as a repeal of the former. (*Illinois and Michigan Canal* v. *City of Chicago,* 14 Ill. 334; *Dingman* v. *People,* 51 id. 277; *Board of Water Comrs.* v. *Conkling,* 113 id. 340; *McCormick* v. *People,* 139 id. 499; *People* v. *Town of Thornton,* 186 id. 162.) It is a principle of statutory construction that where the General Assembly enacts a new statute upon a certain subject and the legislative intention appears from the act to be to frame a new scheme in relation to and to make a revision of the

whole subject, there is, in effect, a legislative declaration that whatever is embraced in the new statute shall prevail and that whatever is excluded shall be discarded. The revision of the whole subject by the new statute evinces an intention to substitute its provisions for the old law upon the subject. (*People* v. *Town of Thornton, supra; State Board of Health* v. *Ross,* 191 Ill. 87; *People* v. *Freeman,* 242 id. 152; *Hoyne* v. *Danisch,* 264 id. 467.) The Public Utilities act, and that portion of sub-section 27 of section 1 of article 5 of the Cities and Villages act invoked by appellant to sustain the ordinance in question, are so clearly inconsistent and repugnant to each other that both cannot by any fair and reasonable construction be reconciled and made effective.

That the power sought to be exercised by the ordinance in question is vested exclusively in the Commerce Commission is further shown by the sixth article of the Public Utilities act, which has reference to local utilities. The article only becomes effective after it has been adopted by a majority of the voters of a city at an election, and when adopted the city becomes vested with certain powers over public utilities furnishing service, products or commodities within the limits of the city, but railroads constituting or used as a part of a trunk railroad system are expressly excepted. If a city, even after the adoption of article 6, has no power to regulate railroads of the character specified, it is difficult to discern how a village which has never adopted that article, and for that reason is not vested with the power of regulating local utilities, can exercise the power claimed by appellant.

The General Assembly, by sub-section 27 of section 1 of article 5 of the Cities and Villages act, effective July 1, 1872, vested in cities and villages organized under that act the power, among others, to require railroad companies to keep flagmen at railroad crossings of streets. This was a delegation to the municipalities designated, of a portion of the

police power of the State. The police power is an attribute of sovereignty and is primarily vested in the General Assembly, which has the right at any time to recall it from the agency to which it has been delegated, and after being recalled to retain it or to confer it upon some other agency of government. In the exercise of this power the State may intervene whenever the public interests demand such interference, and in this respect a large discretion is necessarily vested in the legislature to determine not only what the interests of the public require but what measures are necessary for the protection of such interests. (*Durand* v. *Dyson*, 271 Ill. 382; *Illinois Central Railroad Co.* v. *Willenborg*, 117 id. 203; *City of Chicago* v. *O'Connell*, 278 id. 591.) The General Assembly, in its discretion, withdrew from cities and villages the power here sought to be exercised by the appellant and vested it in the Commerce Commission, another agency of government. That part of subsection 27 of section 1 of article 5 of the Cities and Villages act which conferred upon cities and villages organized under that act the power to require railroad companies to keep flagmen at railroad crossings of streets was repealed by the Public Utilities act.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*

Mr. JUSTICE FARMER, dissenting:

The power of local self-government by municipalities in the adoption of such ordinances as the one here challenged has always been regarded as so desirable and important to cities and villages,—its lawful exercise has existed so long and has been availed of so often,—that it might well be considered a part of our public policy. I am not able to see any public necessity for a change in that regard, or that the public interest would be better served by taking the power to control the matter here involved from municipalities and resting it exclusively in the Commerce Commission. Certainly it is competent for the legislature to do that if it

316—28

thinks proper, but before I would be willing to hold it has done so, its intention will have to be more clearly and unmistakably manifested than it is by the Public Utilities act. That the Commerce Commission may also be given jurisdiction of the subject does not, to my mind, show a clear intention to vest in the Commerce Commission the exclusive control of the entire subject and deprive municipalities of the power to pass ordinances of the character of the one here involved. As I view it, there is nothing so incompatible in the two bodies having concurrent jurisdiction of the same matter as to necessitate holding that the former statute was repealed by implication. The ordinance is a police regulation of the village, the power to adopt which was expressly conferred by the Cities and Villages act. There are numerous instances where municipalities and the General Assembly legislate upon the same subject, and because that is so, ordinances of municipalities are not necessarily invalid. An illustration of this doctrine is *City of Chicago* v. *Union Ice Cream Manf. Co.* 252 Ill. 311. The action in that case was instituted for the violation of an ordinance, adopted in 1905, regulating the sale of food, which provided a penalty for selling or exposing for sale impure, adulterated or harmful food or to which any injurious foreign substance had been added. In 1907 the legislature passed an act which went into effect July 1, called the Pure Food act, and it was contended that by the passage of the Pure Food act the legislature intended to, and did, resume the power delegated by the Cities and Villages act to municipalities to regulate the sale of food by ordinance, and by implication it repealed the power granted municipalities to legislate on the same subject. The court denied that contention and held it was clear the Pure Food act was not intended to deprive municipalities of the authority given them by the provisions of the Cities and Villages act provided the ordinances were not in conflict with the Pure Food act. The court said the great weight of authority is to the effect the legislature may con-

fer police power upon a municipality over subjects within the provisions of existing State laws.   Courts have the same power to review the validity of an ordinance that they have to review the validity of the order of the Commerce Commission.