Helen Hyland, Appellee, v. Chicago & Northwestern Railway Company, Appellant.

Gen. No. 8,265.

428

Opinion filed September 4, 1931.

D. T. SMILEY, NELSON J. WILCOX and NELSON TROTT-MAN, for appellant.

FRANK E. MAYNARD, for appellee.

MR. JUSTICE JETT delivered the opinion of the court.

This is an action on the case brought in the circuit court of McHenry county by Helen Hyland, appellee, to recover damages for alleged injuries sustained by her when. struck by one of the trains of Chicago & Northwestern Railway Company, appellant, at Benton street crossing in the City of Woodstock, Illinois. A jury trial was had which resulted in a finding in favor of appellee and against the appellant for the sum of $4,000, upon which judgment was entered and this appeal followed.

For convenience the appellee will be referred to as the plaintiff and the appellant as defendant.

The declaration consists of five counts. The first avers that the crossing in question was hazardous, subject to heavy traffic and in the heart of the business district of the City of Woodstock; that the defendant had previously maintained gates at said crossing but had removed the gates and had failed to place a watchman at said intersection to warn the public of the use of its tracks and that when the plaintiff with due care and caution for her own safety was walking on the eastern side of said street, approaching said crossing, there was a freight train passing southeasterly over said crossing making a loud and tumultuous noise; that plaintiff observed the rear end of the train approaching and attempted to cross said track when a passenger train of the defendant approached going in

a northwesterly direction and without any warning or signal she was struck causing the injuries complained of. The second and fourth counts aver that the plaintiff being in the exercise of due care, caution and diligence for her own safety, the defendant carelessly and improperly drove and managed the passenger train at a high and dangerous rate of speed, namely, 50 miles per hour through the City of Woodstock and across street intersections with railroad tracks, and that by and through the negligence and improper conduct of the defendant the engine of the train struck and injured plaintiff. The third count charges wilful and wanton conduct. The fifth count as amended charges that a freight train was running easterly on the northerly track and making a loud and deafening noise; that the defendant had installed and maintained at the crossing four gongs or alarm bells electrically controlled or operated so that when a train was on or near the crossing the gongs and alarm bells rang incessantly and continuously and created a bedlam of noise, all of which were ringing loudly, which together with the noise of the freight train, were deafening to plaintiff; that because of this noise plaintiff could not hear any other sound or noise; that appellant approached the crossing, saw the freight train passing easterly on the northerly track, came to a stop and stood waiting for the freight train to pass by and observed the end of the freight train approaching; and that plaintiff having due regard and caution for her own safety, defendant drove its train at a high and dangerous rate of speed without sounding any alarm bell or whistle, with full knowledge that plaintiff was standing upon or dangerously near the track, with utter disregard for life and limb of plaintiff, and knowing that plaintiff was unaware of the approach of the train, carelessly and improperly drove and managed the train thereby injuring the plaintiff. The record

discloses that at the close of plaintiff's testimony the third count was withdrawn from the consideration of the jury.. "Wilful" and "wanton" were stricken from the fifth count on motion of the plaintiff. The defendant moved to strike the first count. In reply to the motion the trial court said: "I don't just feel like taking the responsibility of saying in this case at this time as a matter of law that there was no negligence."

To the declaration the defendant pleaded the general issue.

A number of reasons are assigned and argued for a reversal of the judgment. It is first contended by the defendant that the plaintiff was guilty of contributory negligence as a matter of law. It appears that the plaintiff and her mother were struck by one of defendant's passenger trains at an intersection of the defendant's railroad tracks and Benton street in the City of Woodstock. The tracks run in a northwesterly and southeasterly direction and the street runs north and south, and, accordingly, the tracks do not cross the street at right angles. The evidence shows that the plaintiff and her mother were walking on the east sidewalk on Benton street toward the crossing in question at about five o'clock in the evening of September 15, 1928. A freight train traveling in a southeasterly direction was passing over the crossing on the northerly tracks. At this crossing there was a wigwag and bell signal in the center of the street on the south side of the tracks about 14 feet south of the center line of the nearest or south track, measured parallel to the sidewalk line. Measured at right angles with the rail the testimony discloses the distance is 11 feet. The wigwag was operating as plaintiff and her mother approached the track. The bell attached to the wigwag was ringing. The evidence tends to show that plaintiff and her mother were looking away from the direction from which the passenger train was approaching, and

toward the northwest from which direction the end of the freight train was coming. The evidence is to the effect that immediately after the plaintiff and her mother reached the southerly track they were struck by a passenger train coming from the southeast. The train consisting of a locomotive, baggage car and six coaches was approaching Woodstock from Chicago. The station is just west of Benton street crossing. The evidence shows that as the train rounded a curve 2,510 feet east of the crossing it was traveling about 50 miles per hour; that the engineer applied the service brakes and reduced the speed preparatory to making the station stop. It appears that the plaintiff and her mother first came into view of the engineer and fireman when the engine was over the Jackson street crossing which was about 660 feet east of the Benton street crossing. The evidence discloses that the engineer immediately applied the emergency brakes and sounded several short sharp blasts with his whistle but was unable to avoid the collision. At the time the emergency application was made the speed of the train approaching the station was estimated to be 35 miles per hour by a witness for the plaintiff, and at 25 miles per hour by the engineer and fireman.

It was incumbent on the plaintiff to prove that she was in the exercise of ordinary care for her own safety at the time and immediately before she was struck by the train of the defendant company. The records fails to show any negligence on the part of the defendant unless the speed of the train as it approached the station constituted negligence.

Whether the whistle was sounded or the bell on the engine rung is not involved in this cause.

The averments of the first count of the declaration relative to the fact that the defendant removed the safety gates present no issue in this case. The record establishes the presence at the crossing in question of

the wigwag protection working properly. The character of protection at crossings in municipalities is a question which the legislature has intrusted to the Illinois Commerce Commission whose jurisdiction over such matters has been held to be exclusive.

In *City of Witt v. Cleveland, C., C. & St. L. Ry. Co.,* 324 Ill. 494, at 495, 496, the court said:

"While prior to January 1, 1914, cities in this State had power to pass ordinances regulating the speed of trains while passing through such cities, the General Assembly by the passage of 'An act to provide for the regulation of public utilities,' approved June 30, 1913, in force January 1, 1914, created the Public Utilities Commission, and by 'An act concerning public utilities,' approved June 29, 1921, in force July 1, 1921, (Cahill's St. ch. 111a, ¶ 16 *et seq.,* Laws of 1921, p. 702), created the Commerce Commission and vested it with general supervision of all public utilities, including the power, by general or special orders, rules or regulations, or otherwise, to require every public utility to maintain and operate its plant, equipment or other property in such manner as to promote and safeguard the health and safety of its employees, passengers, customers and the public, and to this end to require the performance of any act which the health or safety of its employees, passengers, customers or the public may demand. (Cahill's St. ch. 111a, ¶ 76, Laws of 1921, sec. 57, p. 733.) By this act the General Assembly, in its discretion, withdrew from cities and villages the power theretofore exercised by them with reference to the speed and operation of railway trains and such power is now vested in the Commerce Commission, another agency of the government. *Village of Atwood v. Cincinnati, Indianapolis and Western Railroad Co.,* 316 Ill. 425; *Northern Trust Co. v. Chicago Rys. Co.,* 318 Ill. 402."

As bearing upon the question as to whether or not the plaintiff was guilty of contributory negligence, it is well in passing to examine the record which discloses that she testified on direct examination as follows:

"As to just how I went down to the railroad tracks and what I saw and what I did there at that time, I walked down Benton Street and I stopped, oh I guess it was about—about ten feet from the track and I looked up and down and I didn't see anything coming, no train, but a freight train was passing. The freight train was passing on the other track. It was on the second track going to the right as we were going north. It was going to the east. Then we saw the end of the train, the freight train. It was about three car lengths I guess away from me to the left. And then I stood there oh gee, I don't know how long, a very very short time anyway; it was less than a minute, less than a second, and it was—the freight train was just going to pass and we were just going to cross and then—I heard an awfully loud whistle and then—a loud, a very loud whistle, I looked around and there the train was almost—gee, it almost seemed it was on top of me."

"As to how far I could see up the track when I looked, oh about between sixty to a hundred feet I guess. Sixty to a hundred feet; I don't know; it is hard to tell the distance. As to how long it was from the time that I looked up the track until I stepped down to where the train struck me, well, it wasn't a minute, it was less than a minute; about forty-five seconds, something like that. It is hard to tell."

On cross-examination she put the place where she stopped and looked at ten or twelve feet from the track. She testified further:

"Q. So that after you passed this ten foot spot where you had already looked to the east you didn't

look again to the east until you were struck, is that true?  A.  No, I didn't.

Q.  That is, you didn't look?  A.  I didn't look again, no.  What was the use?  I had just looked.  What do you want me to do stand there and stand?

Q.  What did you think those bells meant when you heard them ringing?  A.  I thought they were ringing because the freight train was passing.

Q.  You knew, of course, they were ringing for a train, didn't you?  A.  Yes.

Q.  You know, do you not, that when the bells ring it is because a train is coming?  A.  Yes.

Q.  And it means look out, doesn't it?

Mr. Maynard:  That is objected to.  A.  Yes."

The evidence shows that plaintiff and her mother were both inside of and had passed the line of the wigwag and that they had their backs toward the oncoming passenger train.  The wigwag was working and bell signals were ringing on both sides of the track at Benton street crossing.  The defendant in operating the wigwag and sounding the bells had done everything that was required of it in the way of crossing protection and in protecting the traveling public.  The wigwag was flashing danger and waving a red light back and forth and the bell was ringing loudly and this was the proper operation of the wigwag and bell. The proper application of the wigwag and the sounding of the bell is now urged as an excuse for not seeing or hearing the approach of the passenger train.  We have this peculiar question presented by the record. The defendant company is confronted with a duty to warn travelers upon a highway of the approach of a train and at the same time, in view of the contention of the plaintiff, is under a duty to omit its warning signals, lest their noise constitute a diverting circumstance excusing the highway traveler, who wholly disregards the warning from using any care whatever to

ascertain whether a train is approaching. The warning given by the defendant company by the operation of the wigwag and the sounding of the bell was not merely of the presence of the freight train. It was a warning of the possibility of any train approaching the crossing in question. The plaintiff admits she only looked once and that 10 feet from the track. She seeks to excuse her failure to see the train by stressing the obstructions to her view. The modern wigwag and bell, like its predecessors, the crossing flagman and the crossing gate, serves as a warning to persons approaching the track that a train is to be expected.

In *Chicago & E. R. Co. v. Sutherland,* 88 Ill. App. 295, a pedestrian approached and went upon a crossing of a double tracked railroad where the gates were up, but where on the farther of the two tracks a train was approaching from the north. He testified he waited for this train to pass; that it made "a terrible noise"; that, feeling it was too close he stepped back, and then was struck by a north-bound train on the nearer track, which was the first intimation he had of the approach of the north-bound train. In its opinion the court at page 298, among other things, said:

"The only remaining ground upon which the charge of appellants' negligence rests, is that gates were not lowered on the east side of the crossing, from which appellee approached when he turned to go back across the tracks, according to his own version, just before the accident. It appears that there was nothing to obstruct his view of the tracks in either direction. He heard and saw the train approaching from the north, and stopped to let it pass. We said in *Theobald v. C., M. & St. P. Ry. Co.,* 75 Ill. App. 208, on p. 215, that gates are put up to give warning that trains are passing or about to pass; and when the appellee saw a train going by in front of him, he had all the warning that the gates could have given, even if a dozen trains

had been approaching. The train which struck him was in full view. Its approach was not concealed by the train going south which he says was passing before him. He was injured because he remained so near the rail as to be struck by the right side of the pilot beam of the engine of the north bound train. The evidence affords no ground for concluding that his being in such position was the result of any negligence on the part of appellants. See, also, *Bjork v. I. C. R. R. Co.*, 85 Ill. App. 269, and *I. C. R. R. Co. v. Batson*, 81 Ill. App. 142–153.''

*Ludolph v. Chicago & Northwestern Ry. Co.*, 116 Ill. App. 239, was a case that resembles the instant one very much and in its opinion, among other things, the court said: ''When railroad crossing gates are lowered where two or more tracks are crossed by a street, they are a signal, not merely of the use of the crossing by one train, but by all trains that may then approach and desire to pass; and no one is justified, so long as the gates remain down no longer than a reasonable time, to cross over on the supposition that another train will not pass over.''

In *Greenwald v. Baltimore & Ohio R. Co.*, 332 Ill. 627, the court has recently reaffirmed the doctrine that it is the duty of a highway traveler in approaching a railroad track to look where it will do some good where no circumstances are shown to excuse him from looking and that failure so to do constitutes a lack of ordinary care as a matter of law, and at page 631 said:

''The rule has long been settled in this State that it is the duty of persons about to cross a railroad track to look about them and see if there is danger, and not to go recklessly upon the track but to take proper precaution to avoid accident. It is generally recognized that railroad crossings are dangerous places, and one crossing the same must approach the track with the amount of care commensurate with the known danger,

and when a traveler on a public highway fails to use ordinary precaution while driving over a railroad crossing, the general knowledge and experience of mankind condemns such conduct as negligence. (*Graham v. Hagmann,* 270 Ill. 252; *Lake Shore and Michigan Southern Railroad Co. v. Hart,* 87 id. 529; *Chicago, Burlington and Quincy Railroad Co. v. Damerell,* 81 id. 450; *Toledo, Wabash and Western Railway Co. v. Jones,* 76 id. 311.) One who has an unobstructed view of an approaching train is not justified in closing his eyes or failing to look, or in crossing a railroad track in reliance upon the assumption that a bell will be rung or a whistle sounded. No one can assume that there will not be a violation of the law or negligence of others and then offer such assumption as an excuse for failure to exercise care. The law will not tolerate the absurdity of allowing a person to testify that he looked but did not see the train when the view was not obstructed, and where, if he had properly exercised his sight, he must have seen it.''

In *Specht v. Chicago City Ry. Co.,* 233 Ill. App. 384, plaintiff was a passenger on a truck which was struck by a street car at a street intersection. As plaintiff and his driver approached they looked in the direction from which the car was coming and saw no car. They did not look again until too late to avert a collision. In its opinion at page 387, the court, among other things, said: ''No reasonable minds can arrive at a different conclusion than that plaintiff's undisputed evidence shows that he was not free from contributory negligence in failing to look at a time and place when he knew a car might be coming. The contention that because it was the duty of plaintiff to look in both directions, and that because he had looked east as he reached the building line and 'could not look west at the same time without stopping,' furnishes no valid

excuse for proceeding to the center of the street and to a known point of danger without taking a second look in the opposite direction before reaching it. Besides, everyone knows that a momentary glance to the west after looking to the east would have disclosed the danger in ample time to have avoided it, and could have been taken without stopping the truck."

Whether the plaintiff stepped up to the track just before she was struck is, for the purposes of this case, a matter of no consequence. The essential fact is that without looking she approached the place of danger on foot from a point 10 or 12 feet from the track. She did this notwithstanding the fact that the wigwag was flashing and the bell ringing. She passed within the line of the wigwag and when in the zone of danger, failed to look and ignored every warning given her. She failed to use the sense of sight with which she had been endowed. Such conduct can be explained only on the theory that she was wholly absorbed in conversation with her mother and was completely oblivious to her surroundings.

This suggests to our minds the following language from the opinion of the court in *Chicago, B. & Q. R. Co. v. Mahara*, 47 Ill. App. 208, where at p. 212 it was said: "It is clear that he was paying but little, if any, attention to his surroundings and was giving no heed to the approach of the train, which he came there to take. His thoughts were elsewhere, and so far as this train was concerned, he was making no use of any of his senses, nor paying any attention to the business that brought him to the station. . . . Upon the evidence, the accident can only be accounted for upon the belief that he became so abstracted in thought that he was oblivious of his surroundings. It seems clear to us that he was guilty of negligence, which was the proximate cause of his injury."

In *Greenstreet v. Atchison, T. & S. F. Ry. Co.*, 234 Ill. App. 339, plaintiff, riding in a motor truck, looked

more than 50 feet back from the track at a point where his view was obstructed and it appeared that if he had looked thereafter he could not have failed to see the train. In its opinion at pages 345, 346, the court said: "Proof by the plaintiff that he was in the exercise of ordinary care for his own safety is essential to his recovery and the only evidence of anything that the plaintiff did to avoid the injury is that he looked for a train more than 55 feet back of the track at a point where it is undisputed that his view was obstructed. There is no evidence of any kind to show that from the time he passed the obstructions until the collision he did anything to ascertain whether a train was approaching the crossing or to warn the driver of its approach. If he had looked, he could not have failed to see the train."

It will be remembered that the plaintiff was on foot as she approached the crossing in question and was in a position to easily avoid approaching danger. In *Dax v. Chicago, M. & St. P. Ry. Co.*, 185 Wis. 432, 201 N. W. 736, the court said: "In the case of a foot traveler the zone of danger is so narrow and it is so easy for the traveler to reach a place of safety or to remain there, that no close comparison can be made between one traveling on foot and one driving a team or an automobile. . . . The foot passenger has perfect and instinctive control of himself and can almost instantly step outside the zone of danger."

In view of the state of the record we conclude that the question of plaintiff's contributory negligence was, under the facts, not one for the jury. We are of the opinion that the plaintiff was not in the exercise of ordinary care for her own safety at the time of and immediately before she received the injury of which she complains.

In view of the conclusion we have reached we do not deem it necessary to discuss any of the other questions that are raised upon the record in this cause.

We conclude, therefore, by finding and holding that the judgment of the circuit court of McHenry county should be reversed, and the judgment is accordingly reversed.

*Judgment reversed.*