THE VILLAGE OF DOLTON *ex rel.* L.M. WINTER, Plaintiff-Appellee, v. CSX TRANSPORTATION, INC., *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—88—1153

Opinion filed March 30, 1990.

Lewis, Overbeck & Furman, of Chicago (James R. Gannon and Paul V. Esposito, of counsel), for appellants.

Timothy J. Szwed, of Gasperec & Szwed, Ltd., of Homewood (Don A. Moore and Nancy A. Halas, of counsel), for appellee.

Neil F. Hartigan, Attorney General, of Springfield (James E. Weging, Special Assistant Attorney General, of Chicago, of counsel), for *amicus curiae*.

JUSTICE LORENZ delivered the opinion of the court:

This appeal arises from judgments in consolidated actions against railroad carriers CSX Transportation, Inc., and The Baltimore & Ohio Chicago Terminal Railroad Company for obstructing railroad-highway grade crossings located in the Village of Dolton (Village) in violation of a Village ordinance.

We reverse.

In separate quasi-criminal complaints, CSX Transportation, Inc. (CSX), and The Baltimore & Ohio Chicago Terminal Railroad Company (B&OCT) were charged with violations of section 3(a) of the Village's municipal code, prohibiting certain obstructions by trains at railroad-highway grade crossings. Section 3(a) was enacted pursuant to the Village's authority as a home rule unit and specifically provides:

> "It is unlawful for a railroad corporation to permit any train, railroad car or engine to obstruct public travel at a railroad-highway grade crossing for a period in excess of ten (10) minutes, except when such train, railroad car or engine cannot be moved by reason of circumstances of which the railroad corpo-

ration has no control." (Dolton, Ill., Municipal Code ch. 146, §3(a) (1971).)

B&OCT was charged for an obstruction of 13 minutes on November 23, 1986. CSX was charged for obstruction of 13 and 14 minutes on January 8, 1987, as well as for an obstruction occurring on January 4, 1986, lasting 16 minutes.

Defendants filed several motions to dismiss pursuant to sections 2—615 and 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, pars. 2—615, 2—619). All motions were denied, and the matter proceeded to trial. Following trial, judgments were entered in favor of the Village for three violations. Fines of $1,000 were levelled for each violation.

This appeal followed.

Opinion

Although defendants raise numerous challenges to the validity of the ordinance and also challenge the sufficiency of the evidence adduced at trial, we find reason to address only whether the ordinance constitutes an unconstitutional exercise of the Village's home rule authority because we find section 3(a) invalid on that basis.

■■ ■ Article VII, section 6(a), of our constitution empowers home rule units to "exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare[.]" (Ill. Const. 1970, art. VII, §6(a).) The main substantive restrictions on the exercise of local governmental power have come from the various constructions of the "pertaining to its government and affairs" clause and, as such, that phrase is considered one of art. (*Peoples Gas Light & Coke Co. v. City of Chicago* (1984), 125 Ill. App. 3d 95, 465 N.E.2d 603.) In *People ex rel. Bernardi v. City of Highland Park* (1988), 121 Ill. 2d 1, 520 N.E.2d 316, the supreme court noted, most recently, regarding home rule authority:

> "The limited grant of power to home rule units in section 6(a) legitimizes only those assertions of authority that address problems faced by the regulating home rule unit, not those faced by the State or Federal governments. [Citation.] 'Whether a particular problem is of statewide rather than local dimension must be decided not on the basis of a specific formula or listing set forth in the [c]onstitution but with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it.' [Ci-

tation.]" (*Bernardi*, 121 Ill. 2d at 12-13, 520 N.E.2d at 321.)
Those considerations have led the court to apply a three-prong analysis to determine the validity of the exercise of home rule authority. (*Bernardi*, 121 Ill. 2d at 13, 520 N.E.2d at 321.) The analysis consists of an examination of: (1) the extent to which the conduct in question affects matters outside the municipality; (2) the traditional role of municipal verses State regulation in the field; and (3) which level of government has the more vital interest in that regulation. *Bernardi*, 121 Ill. 2d at 13, 520 N.E.2d at 321.

Considering section 3(a) of the Village's municipal code in light of the first prong of the *Bernardi* analysis, we conclude the subject conduct, with some exception, would not appear to affect matters outside the Village. Here, the ordinance reaches only to the obstruction of railroad-highway grade crossings located within the Village's boundaries. Section 3(a) might affect matters beyond those boundaries only to the extent that, because trains operate over a limited set of rail lines, railroad companies may not easily avoid being subject to the Village's ordinance.

However, examination of the second and third prongs of the *Bernardi* analysis indicate section 3(a) constitutes an *ultra vires* exercise of the Village's home rule authority in violation of the limited grant of power allowed in article VII, section 6(a), of the constitution.

■ Regarding the second prong, we conclude regulation of railroad operations, including the specific conduct involved here, traditionally has been placed outside the scope of municipal power. Beginning January 1, 1914, the effective date of "An Act to provide for the regulation of public utilities" (1913 Ill. Laws 459), the General Assembly indicated the intention to vest regulation over railroad operations with State, as opposed to local, government. (See *Northern Trust Co. v. Chicago Rys. Co.* (1925), 318 Ill. 402, 149 N.E. 422; *Village of Atwood v. Cincinnati, Indianapolis & Western R.R. Co.* (1925), 316 Ill. 425, 147 N.E. 449.) Moreover, since July 1, 1921, the effective date of "An Act concerning public utilities" (1921 Ill. Laws 702), that power is enjoyed exclusively by the Illinois Commerce Commission (Commission). (*City of Witt v. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* (1927), 324 Ill. 494, 155 N.E. 325.) The plenary nature of the Commission's power to regulate railroad-highway grade crossings and to make provision for the safety of the public at such crossings has been long recognized by Illinois courts. (*City of Chicago v. Illinois Commerce Comm'n* (1980), 79 Ill. 2d 213, 402 N.E.2d 595.) Further, on January 1, 1986, the Commission's authority to regulate the field was continued under the Illinois Commercial Transportation Law

(ICTL) (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—1101 *et seq.*), the comprehensive recodification of the then existing transportation regulatory schemes (see Ill. Rev. Stat. 1985, ch. 95½, par. 18c—1102(a)).

The Commission's authority to regulate railroad-highway grade crossings is outlined in section 18c—7401(3) of the ICTL. (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—7401(3).) Significantly, the ICTL also addresses the subject of the obstruction by trains at railroad-highway grade crossings. Section 18c—7402(1)(b) of the ICTL provides:

"It is unlawful for a rail carrier to permit any train, railroad car or engine to obstruct public travel at a railroad-highway grade crossing for a period in excess of 10 minutes, except where such train, railroad or car is continuously moving or cannot be moved by reasons of circumstances over which the rail carrier has no reasonable control." (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—7402(1)(b).)

Further, section 18c—7402(1)(a) imposes upon train crews a duty, upon notification, to take "immediate action" to remove an obstruction of an emergency vehicle (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—7402(1)(a)) and, under section 18c—7402(1)(c) (Ill. Rev. Stat. 1985, ch. 95½, par. 7402(1)(c)), a graduated fine schedule based upon the length of each violation is imposed. Violations of section 18c—7402 are enforceable pursuant to section 18c—7403. Ill. Rev. Stat. 1985, ch. 95½, par. 18c—7403.

●4, 5 Examination of the enforcement provision contained in section 18c—7403 leads us to address, at this point in analysis of the traditional role of municipal versus State regulation in the field, the validity of concurrent exercise by the Village regarding obstruction of railroad-highway grade crossings. We note that the constitution permits home rule units to exercise concurrent powers with the State where the General Assembly has not specifically limited such exercise or declared the State's exercise to be exclusive. (Ill. Const. 1970, art. VII, §6(i).) We conclude, however, after considering the language of the enforcement provisions contained in section 18c—7403, the General Assembly intended not to disturb the established role exercised by the State, through exercise of the exclusive authority of the Commission, regarding regulation of railroad-highway grade crossings.

Section 18c—7403, provides, in pertinent part:

"*Except with regard to grade crossing obstructions under Section 18c—7402* \*\*\* jurisdiction to initiate actions to *enforce* provisions of this Chapter is vested exclusively with the Commission.*" (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—7403.)

We note that, although the Commission has enjoyed exclusive authority to regulate railroad-highway grade crossings, municipalities have been permitted to enforce the Commission's regulations. (See, *e.g.*, *People v. Indiana Harbor Belt R.R. Co.* (1981), 102 Ill. App. 3d 811, 430 N.E.2d 104 (enforcement by the village of section 14 of "An Act in regard to the dangers incident to railroad crossings on the same level" (Ill. Rev. Stat. 1979, ch. 114, par. 70), the predecessor to section 18c—4702 of the ICTL).) Thus, although we acknowledge home rule units may exercise concurrent power with the State in certain instances, we are persuaded the permissive grant of power to municipalities to enforce the Commission's regulations pertaining to railroad-highway grade crossing obstructions indicates the General Assembly's intent to preserve the limited role traditionally practiced by municipalities in the field.

At last concerning the traditional role of municipality verses State regulation in the field, we point out that, in addition to the ICTL, chapter 114 of Illinois Revised Statutes contains acts regulating virtually every aspect of the organization and operation of a railroad in this State. See Ill. Rev. Stat. 1985, ch. 114, pars. 1—29, 29a through 29e, 30 through 34, 35 through 38, 39 through 42.1, 43 through 45.1, 46 through 46.1, 47 through 47.1, 48 through 49, 49a through 49a.1, 49b through 49b.1, 49c through 49d, 52 through 52.1, 98 through 100, 100a through 100d, 100e through 100h, 101 through 104, 104.1 through 104.3, 105 through 110, 229 through 232, 361 through 389, 601.

■ Regarding the third prong of the *Bernardi* analysis, we need only look to the stated public policy underlying codification of the ICTL to conclude the State, rather than the Village, has the more vital interest in regulating rail transportation, in general, and railroad-highway grade crossing, in particular. In section 18c—1103 of the ICTL, the General Assembly expressly recognized the State's interest in "actively supervis[ing] and regulat[ing] commercial transportation of persons and property within this state," as the policy foundation for recodification of then existing transportation schemes into the ICTL. (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—1103.) To the extent municipalities across the State might, through home rule authority, pass ordinances affecting railroad operations, the goals enumerated in section 18c—1103, including "insur[ing] a stable and well-coordinated transportation system for shippers, carriers and the public," would be jeopardized. (Ill. Rev. Stat. 1985, ch. 95½, par. 18c—1103.) To permit municipalities to exercise concurrent regulation in the field of railroad operations would certainly subject carriers to multiple, and possibly

conflicting, governmental requirements and disturb the existing comprehensive regulatory scheme.

Based on our analysis above, in light of the considerations set forth by the supreme court in *Bernardi*, we conclude section 3(a) of the Village's municipal code does not "pertain to its government and affairs" and therefore is in violation of the limited grant of power afforded home rule units by article VII, section 6(a), of our constitution.

Reversed.

COCCIA, P.J., and MURRAY, J., concur.