(No. 30408.—

MISSOURI PACIFIC RAILROAD COMPANY, GUY A. THOMPSON, Trustee, Appellant, *vs.* ILLINOIS COMMERCE COMMISSION *ex rel.* Brotherhood of Railroad Trainmen *et al.,* Appellees.

*Opinion filed September 24, 1948—Rehearing denied Nov. 11, 1948.*

JOSIAH WHITNEL, and RALPH WALKER, both of East St. Louis, (T. T. RAILEY, of St. Louis, Mo., of counsel,) for appellant.

GEORGE F. BARRETT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and JAMES C. MURRAY, all of Chicago, of counsel,) for appellee Illinois Commerce Commission.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

Missouri Pacific Railroad Company, Guy A. Thompson Trustee, appellant, seeks reversal of the judgment of the Jackson County circuit court which confirmed two orders

of the Illinois Commerce Commission requiring it to provide or cause to be provided and thereafter to maintain rear-end flag protection for its passenger trains numbers 335 and 336 in the manner set forth and prescribed in operating rules 99 and 885 of its current Uniform Code of Operating Rules. The Brotherhood of Railroad Trainmen, by its legislative representative and the Order of Railway Conductors of America by T. S. Roe, its representative and as an individual, filed their two respective complaints with the Illinois Commerce Commission seeking the relief which the commission granted. The cases were consolidated in the circuit court and disposed of by a single order.

Appellant's passenger trains numbers 335 and 336 operate daily between Valley Junction near East St. Louis and Marion, Illinois, a distance of approximately 130 miles. No. 335 is scheduled to leave Valley Junction at 6:15 P.M. daily and arrive at Marion at 10:45 P.M., while train No. 336 is scheduled to leave Marion at 7:00 A.M. daily and to arrive at Valley Junction at 11:09 A.M. Except as to time and direction, the facts in general applicable to one of these trains applies to the other.

Appellant has a double track from Valley Junction to Flinton, a distance of about 49 miles, the first 9 miles of which is protected by automatic block signals and is within certain yard limits. From Flinton to Raddle Junction, a distance of about 27 miles, the track is single with centralized traffic control. From Raddle Junction to Gorham, a distance of about 9 miles, there is a double track and from Gorham to Marion, a distance of about 43 miles the track is single with no traffic-control signals except for a distance of three or four miles where automatic signals are in use. There is, however, a yard-limit restriction on speed on this stretch of single track from Bush to Marion, a distance of approximately 20 miles. Within yard limits second and inferior class trains, extra trains and engines must move at restricted speed, which means a speed at which the train

may be stopped within the range of the vision of the engineer, and all trains and engines running against the current of traffic must move at restricted speed. Johnson City is a short distance off the branch line and is within yard-limit restrictions. To reach it these trains are backed through a wye a distance of about 1.33 miles.

It will be seen that there are approximately 30 miles of the distance traveled by these trains within yard limits, 13 miles protected by automatic block signals and 27 miles protected by centralized traffic control, making a total of 70 miles, 9 of which are protected by both automatic block signal and yard-limit rules and regulations. This leaves approximately 60 miles of the distance traveled without any protection other than that furnished by members of the crew.

These trains usually consist of a gas-electric motor combination car which seats about 50 passengers, and a trailer in which baggage, express and mail are carried. The crew consists of an engineer, conductor and joint express-baggageman over the entire route. A mail clerk operates between Murphysboro and St. Louis in both directions as a government employee. The express-baggageman is an employee of the express company but appellant pays one half of his salary. When the motor car is not available, a steam engine and coach is substituted therefor and a brakeman or flagman is then provided under the terms of a contract between appellant and its employees.

There are approximately 17 station stops and 13 flag and other stops for each train. The track from Valley Junction to Gorham, a distance of 84 miles, is known as main-line track and that from Gorham to Marion, about 43 miles, is known as branch-line track. The conductor in case of emergency may call upon the express-baggageman to perform the duties of flagman. This employee has been instructed in the duties of a flagman but is not required

to pass the Uniform Code of Operating Rules nor is he required to attend the schools of instruction. On a number of occasions the seating capacity has been inadequate for the passengers and they were required to and did crowd the aisle making it difficult for the conductor to work the train and collect the fares. Sometimes they have overflowed into the baggage car. The average number of passengers carried daily by each of these trains is approximately sixty.

There is a crossover movement near Gorham where several tracks are crossed in the operation of which the conductor is required to leave the train and line the switches by hand, using about five minutes for that purpose. While the conductor is performing these duties no member of the train crew serves as flagman in protecting the train. There is no evidence that the express-baggageman has ever served as a flagman for these trains.

The main-line track in general parallels the Mississippi River and No. 335 operates after dark during the greater portion of the year. In addition to the darkness there are frequent fogs and dense smoke along the river bottom. The main line is used jointly with the St. Louis Southwestern Railroad Company known as the Cotton Belt Route. Together these roads run at least fifty trains per day over the main line between Dupo and Gorham to the south and about sixty trains per day between Dupo and Valley Junction to the north. The case was taken by the commission January 22, 1946. The time covered by the testimony included some war-time movements and the testimony shows that since world war fighting ceased the number of freight trains was decreasing materially and had by August, 1945, decreased 26.5 per cent as compared with a twenty-day period in August, 1944. On the branch line there is an average of five trains daily each way between Gorham and Bush and four trains each way between Bush and Marion.

The main-line track is fairly straight and level, but the branch line has many curves and grades. The train stops vary in time from a few seconds to five minutes. The permissible speed of passenger trains is 60 miles an hour and that of freight trains about 45 miles per hour. The evidence shows that on a number of curves a fusee is thrown from the train by the conductor to warn any train following. As many as 15 fusees have been used in the course of a trip. When a flagman is protecting a train he often uses a lighted fusee or lantern at night and a flag by day. At times he also places torpedoes on the rail before returning to his train. No rear-end collision has occurred on either of these trains.

A number of appellant's trains move under schedule, but a train's running time may be disturbed by any number of causes and the schedule thereby disrupted. A freight train due to leave the Dupo yard ahead of No. 335 frequently is delayed until No. 335 passes and then follows it out. When a following train may show up at a given place cannot be definitely determined, and a train crew must be prepared to protect their train at all times.

The commission found that the conductor has general charge and direction of the train and on account of his duties has no time to give flag protection to the train; that the baggage-expressman is stationed in the forward end of the rear car and by reason of his duties in handling baggage, express and company mail he is not in a position to perform the duties of flagman; that accordingly no rear-end flag protection is afforded these trains as required under appellant's operating rules. The commission further found that a hazardous condition exists by reason of the lack of rear-end flag protection in that the lives of employees and the public are imperiled thereby and that the public safety requires rear-end flag protection for these trains which should be provided in the manner as set forth and prescribed in appellant's current operating rules 99 and 885.

Upon the above facts the orders as hereinbefore mentioned were entered. They have the force of a statute and if violated a penalty is incurred.

The operating rules referred to provide in substance that when a train stops under circumstances in which it may be overtaken by another train, the flagman must go back immediately with flagman's signals a sufficient distance to insure full protection, placing two torpedoes, and when necessary in addition displaying lighted fusees; that when recalled and safety to the train will permit he may return; that when conditions require, he will leave the topedoes and the lighted fusees; that when a train is moving under circumstances in which it may be overtaken by another train, the flagman must take such action as may be necessary to insure full protection; that by night or by day when the view is obscured, lighted fusees must be thrown off at proper intervals; that when day signals cannot be plainly seen owing to weather or other conditions, night signals must be used; that conductors must not allow other duties to interfere with the proper protection of their train, and must require their flagmen to act promptly and in accordance with the rules; that trains carrying passengers must be properly protected; that the first duty of the flagman is to protect the rear end of the train and when requirements of rules permit at station stops of usual duration and under normal conditions he should stand about 30 feet to the rear of the train and that his usual position is at the rear end of the last car.

Appellant contends that the findings of the commission, confirmed by the lower court, are contrary to the manifest weight of the evidence and not supported by evidence contained in the record; that the orders do not meet the standard of definiteness and certainty required by mandatory orders; that they are arbitrary and unreasonable and invade appellant's right of management and are not a valid exercise of the police power; that appellant is deprived of

its liberty and property without due process of law in violation of section 2 of article II of the Illinois constitution.

The Public Utilities Act provides for judicial review of orders of the commission. Unless the basic finding necessary to a valid order is made by the commission, the order may be set aside. *Public Utilities Com. ex rel. Chicago Board of Trade* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.,* 288 Ill. 502; *Public Utilities Com. ex rel. Chicago Board of Trade* v. *Toledo, St. Louis and Western Railroad Co.* 286 Ill. 582.

The statute further makes the findings and conclusions of the Commerce Commission on questions of fact *prima facie* true, and its orders and decisions are not to be set aside unless clearly against the manifest weight of the evidence or outside the jurisdiction of the commission. (Ill. Rev. Stat. 1947, chap. 111⅔, par. 72.) Its orders and decisions are to be considered as *prima facie* reasonable and the burden of proof upon all of the issues raised by an appeal is upon the one appealing. (*Chicago Motor Bus Co.* v. *Chicago Stage Co.* 287 Ill. 320; *Chicago and Eastern Illinois Railway Co.* v. *Commerce Com. ex rel. Cairo Association of Commerce,* 343 Ill. 117.) This court is not authorized to substitute its judgment for that of the commission in order to put itself in place of the commission and try the issues presented. *Commerce Com. ex rel. Illinois Traction, Inc.* v. *Omphghent Township,* 326 Ill. 65. *Egyptian Transportation System, Inc.* v. *Louisville and Nashville Railroad Co.* 321 Ill. 580.

From the evidence contained in this record we cannot say that the findings and orders of the commission have no substantial support therein or that they are contrary to the manifest weight of the evidence.

Complaint is made that the commission failed to find specifically that the signal devices and other methods of protection used by appellant were inadequate and that there was no finding that an additional employee on these trains

is *demanded* to protect the health and safety of appellant's employees, passengers or the public. Appellant argues that the case of *Chicago Great Western Railway Co.* v. *Commerce Com. ex rel. Brotherhood of Railroad Trainmen,* 398 Ill. 190, is in point and is controlling here. There seems to be quite a difference between that case and the one before us. In the former case there was an automatic block signal system in operation over the entire length of the railroad. In that case there was a flagman, the contention being that another one should be added on trains of five or more cars. There were interlockings, private telephones in each station and at each end of passing tracks, and a portable telephone was carried in the baggage car to be used in case of emergency to communicate with the dispatcher. In the present case, as before indicated, approximately one half the distance traveled by these trains is over track unprotected by mechanical signals. There could be no finding as to inadequacy of signals where none existed. The orders do find in substance that the present system used by appellant is inadequate. They find in part "that a hazardous condition exists by reason of the lack of rear-end flag protection for respondent's passenger trains Nos. 335 and 336 in that the lives of employees and the public are imperiled thereby" and "that public safety requires rear-end flag protection for respondent's passenger trains," etc.

Appellant urges with much force that the orders are insufficient in not finding that the safety of appellant's employees, passengers, customers or the public *demands* the rear-end flag protection required. Section 57 of the Public Utilities Act, after enumerating a number of things which the commission may require of a public utility, says: "and to require the performance of any other act which the health or safety of its employees, passengers, customers or the public may demand." The finding of the commission, it will be noted, is that a hazardous condition exists and that lives are imperiled thereby; that rear-end flag pro-

tection for said trains is necessary in the interest of public safety and that public safety requires rear-end flag protection, etc. We can think of no situation where such protection is necessary and required but not demanded. We do not believe the legislature intended that the findings in this connection must actually use the word "demand;" nor did this court in the *Chicago Great Western Railway Co. case* hold that no other word could be used expressing the need for other or additional service in the interest of public safety, etc. The following cases indicate that the words "require" and "demand" may be used in the same sense: *Vogrin* v. *American Steel and Wire Co.* 263 Ill. 474; *Concordia Fire Ins. Co.* v. *Bowen,* 121 Ill. App. 35. Webster's New International Dictionary, defines the word "require" in part as, "to demand or exact as necessary or appropriate," and defines the word "demand" to mean, in part, to require or to be in need of.

It is also argued by appellant that the orders requiring rear-end flag protection "in the manner set forth and prescribed in operating Rules 99 and 885 of its current Uniform Code of Operating Rules" do not meet the standard of definiteness and certainty required of the commission's mandatory orders. Appellant has cited many cases holding that a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. To that effect are, *Connally* v. *General Construction Co.* 269 U. S. 385; *People* v. *Yonker,* 351 Ill. 139; *Mayhew* v. *Nelson,* 346 Ill. 381; *Welton* v. *Hamilton,* 344 Ill. 82, and many others. We agree with that principle. But a statute imposing a duty in general terms is not void for uncertainty if the words used have either a technical or special meaning sufficiently known or understandable to enable compliance therewith or have acquired an established meaning through established precedents. (*Boshuizen* v.

*Thompson & Taylor Co.* 360 Ill. 160; *People* v. *Mancuso,* 255 N. Y. 463, 175 N. E. 177.) Statutes are presumed to be constitutional and valid, and every reasonable doubt is resolved in favor of their validity. *People ex rel. Christensen,* v. *Board of Education,* 393 Ill. 345; *Liberty Foundries Co.* v. *Industrial Com.* 373 Ill. 146; *Peoples Gas Light and Coke Co.* v. *Slattery,* 373 Ill. 31.

In the *Christensen case* the specific objections were that the statutes in question were unintelligible, and failed to set up a standard for the conduct of elections of members of the board of education by failing to prescribe the manner and method of so electing them. In holding against this contention we said in part: "The points made by respondent attempting to prove that the law is incomplete and is so vague, indefinite and uncertain that it cannot be put into execution, if adopted by this court, would render practically every law invalid. The omission in the statute to specify every detail step by step, and action by action, will not render a law vague, indefinite or uncertain from a constitutional standpoint." Appellant has adopted the rules in question and they have been in use by it for many years. All its flagmen operate under them and are governed by them. All that the orders require is the same protection to trains 335 and 336 that the rules in question afford to other trains operating under them. In view of this situation we cannot hold as a matter of law that the orders are so indefinite and uncertain as to render them invalid.

Upon careful consideration of the whole record, we are satisfied the commission was within its jurisdiction in entering the orders and that the orders are supported by sufficient evidence and are valid. The judgment of the lower court confirming the findings and orders of the commission is therefore affirmed.

*Judgment affirmed.*